*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0434p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MAUREEN DEAL; PHILLIP DEAL, Parents, On Behalf of
Zachary Deal,

      *Plaintiffs-Appellants,*

   *v.*

HAMILTON COUNTY BOARD OF EDUCATION,

      *Defendant-Appellee.*

No. 03-5396

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 01-00295—R. Allan Edgar, Chief District Judge.

Argued: August 12, 2004

Decided and Filed: December 16, 2004

Before: MOORE and COLE, Circuit Judges; MARBLEY, District Judge.[*]

---

## COUNSEL

**ARGUED:** Gary S. Mayerson, MAYERSON & ASSOCIATES, New York, New York, for Appellants. Charles L. Weatherly, THE WEATHERLY LAW FIRM, Atlanta, Georgia, for Appellee. **ON BRIEF:** Gary S. Mayerson, MAYERSON & ASSOCIATES, New York, New York, Theodore R. Kern, Knoxville, Tennessee, for Appellants. Charles L. Weatherly, Thomas W. Dickson, Jennifer R. Fain, Kathleen A. Sullivan, THE WEATHERLY LAW FIRM, Atlanta, Georgia, for Appellee.

---

## OPINION

---

  ALGENON L. MARBLEY, District Judge. This case arises under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ("IDEA"), and corresponding Tennessee laws and rules. Plaintiffs-Appellants, Maureen and Phillip Deal (the "Deals"), bring this action for and on behalf of their autistic son, Zachary. Defendant-Appellee is the Board of Education of Hamilton County, Tennessee (the "School System"). Plaintiffs-Appellants appeal the decision of the district court reversing in part and affirming in part the decision of the administrative law judge ("ALJ") who presided over the administrative hearing. Plaintiffs-Appellants assert that the School System failed to provide Zachary with a "free and

---

 [*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

appropriate public education" ("FAPE") in Zachary's "least restrictive environment" ("LRE") and that they therefore are entitled to reimbursement from the School System for the education that they provided Zachary at their own expense. The ALJ found several procedural and substantive violations of the IDEA and ordered the School System to pay some of the reimbursement sought by the Deals. The district court found no IDEA violations and reversed the reimbursement ordered by the ALJ. Based on the following analysis, the Court **AFFIRMS** in part and **REVERSES** in part.

## I. BACKGROUND

### A. Factual Background

In 1997, when Zachary was three years old, the School System and the Deals developed Zachary's first "individualized education program" ("IEP").[1] Pursuant to the terms of the IEP, Zachary attended a preschool comprehensive development class ("CDC") at Ooltewah Elementary School. While Zachary was assigned to Ooltewah, his parents, in September 1997, began to teach Zachary outside of school using a program developed by the Center for Autism and Related Disorders ("CARD"). According to the ALJ, this program is patterned after a methodology for treating autistic children developed by Dr. Ivar Lovaas at the University of California at Los Angeles.[2] The CARD program consists of one-on-one applied behavioral analysis ("ABA") that relies heavily on extremely structured teaching and comprehensive data collection and analysis.

On May 11, 1998, an IEP team met to consider extended school year ("ESY") services for Zachary. The Deals, convinced that Zachary was making exceptional progress because of the one-on-one ABA program they were funding in their home, requested that the School System fund a 40-hour per week home based ABA program for the summer, as well as provide for year-round speech therapy. The School System refused to fund the parents' program and likewise refused to provide the Deals with data regarding the efficacy of the School System's approach to teaching autistic children. Instead, the agreed upon IEP provided for ESY services consisting of three 45 minute speech therapy sessions per week.

On October 9, 1998, an IEP meeting was held to develop Zachary's 1998-1999 IEP. The 95-page IEP, dated October 15, 1998, provided, among other things, for 35 hours per week of special education instruction, with many explicit goals.[3] Zachary also was to receive related services, including physical therapy and speech therapy. The Deals filed a "minority report" requesting that the School System fund their private ABA program in the home. The School System convened additional IEP meetings that were

---

[1] Zachary has been diagnosed with autism spectrum disorder, hereinafter referred to as "autism":

> "Autism" means a developmental disability, which significantly affects verbal and nonverbal communication and social interaction, generally evident before age three (3), that adversely affects a child's educational performance. Other characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

TN Bd. Educ. R. 0520-1-9-.01(15)(a). Zachary exhibits certain of the characteristics associated with autism, including deficits in communication and social interaction.

[2] Dr. Lovaas, in his seminal research conducted in the 1980s on methodologies for teaching autistic children, achieved extraordinary results. Virtually all students in his study group showed significant improvement, and his best outcome students exhibited dramatic gains in IQ and in their ability to function within a regular educational setting. A follow up study published in 1993 found that 47% of the students who had received Dr. Lovaas's intervention went on to become "indistinguishable" in their regular education classrooms. he ALJ found that Lovaas style interventions of ten hours per week or less have no effect.

[3] The School System informed the Deals that several teaching methodologies would be utilized for Zachary, including discrete trial teaching, incidental teaching, activity-based learning, and structured teaching.

attended by the Deals in November 1998, December 1998, February 1999, and March 1999 to discuss Zachary's progress and the Deals' concerns. During the 1998-1999 school year, Zachary attended the School System's program only 16% of the time.

At a May 24, 1999, IEP meeting, the Deals requested an ESY program of 43 hours per week of one-on-one ABA therapy and 5 hours per week of speech therapy. The IEP team determined that it could not document any regression Zachary would suffer without ESY services due to his lack of attendance at the School System's program, so the School System declined to offer any ESY services.

On August 20 and again on August 25, 1999, an IEP team met to develop an IEP for Zachary for the 1999-2000 school year. The School System proposed that Zachary would, in addition to his CDC classes, attend a regular kindergarten classroom three times per week for 15 minutes each. He would also have lunch with a regular kindergarten class. The time spent with the regular class would increase as Zachary was able to tolerate it. Zachary would have with him a classroom assistant familiar with and trained to meet his needs. The proposal included specific goals and objectives. Teaching methods would include one-on-one discrete trial teaching; the use of picture cues; incidental teaching to provide an opportunity for carry over and application of learned skills; continual use of functional communication techniques; activity-based instruction; the use of music, story telling, and reading; and other techniques. The proposal also provided for speech and language therapy for 30 minutes five times per week, occupational therapy two times per month, and physical therapy for 30 minutes once a week.

On September 2, 1999, Zachary began attending a private preschool, the Primrose School, at which his parents had enrolled him. Zachary attended a regular pre-K class at the Primrose School for 3 hours per day, 2 days per week, with a personal aide paid for by the Deals. On September 7, 1999, the Deals informed the School System of their rejection of the IEP in favor of the private program. The Deals' disagreement with the IEP stemmed from their belief that Zachary should spend more time in a regular education classroom, as well as their desire to have the School System pay for the CARD program or offer similar ABA therapy. On September 16, 1999, the Deals requested a due process hearing under the provisions of the IDEA. Zachary did not attend public school at all during the 1999-2000 school year.

On August 11, 2000, an IEP meeting was held to develop an IEP for Zachary for the 2000-2001 school year. The proposed IEP called for Zachary to be placed primarily in a regular education kindergarten class at Westview Elementary School. The IEP included specific goals and objectives and provided for various support services, including pre-teaching and re-teaching sessions. The full school day and week program included related services of speech therapy and occupational therapy. The Deals rejected the IEP and continued to insist that the School System pay for their private ABA program for Zachary. Zachary did attend Westview that year, but only part time.

## B. Procedural History

The administrative hearing requested by the Deals on September 16, 1999, began on March 15, 2000, and concluded on February 13, 2001. The hearing encompassed 27 full days of testimony from 20 fact and expert witnesses. The ALJ also reviewed tens of thousands of pages of exhibits, viewed several video tapes, and personally observed Zachary in a number of settings.

In an opinion and order dated August 20, 2001, the ALJ made explicit credibility findings as to all 20 witnesses and provided 191 findings of fact. He also announced the following legal conclusions:

(1)     The School System violated the procedural requirements of the IDEA by predetermining, pursuant to an unofficial policy of refusing to consider "Lovaas style ABA," that the School System's extant program was appropriate for Zachary.[4]

(2)     The School System's failure to have regular education teachers attend the IEP team meetings also constituted a procedural violation.

(3)     These procedural violations themselves amounted to denial of a FAPE.

(4)     The School System had substantively violated the IDEA by failing to provide a proven or even describable methodology for educating autistic children.[5]

(5)     An additional substantive violation resulted from the School System's failure to provide Zachary with 30 hours per week of the intensive Lovaas style ABA that had been proven to be effective for him.[6]

(6)     The School System also substantively violated the IDEA by failing to provide Zachary with ESY services in 1999.

(7)     The Deals were not entitled to reimbursement for private evaluations of Zachary.

(8)     The Deals were entitled to reimbursement for up to 30 hours per week of the home based ABA services they had provided to Zachary, and the School System was to continue to reimburse the Deals for such services until a properly constituted IEP team, which must include at least one expert in and advocate for Lovaas style ABA, had developed an IEP for Zachary that included at least 30 hours per week of Lovaas style ABA.

(9)     The School System did not sufficiently consider the LRE requirement of the IDEA in developing Zachary's 1999-2000 IEP, but the Deals nonetheless were not entitled to reimbursement for Zachary's tuition at the Primrose School because they failed to provide the School System with the required statutory notice.

---

[4]The ALJ concluded that the School System's refusal to offer Lovaas style ABA was based largely on cost considerations. Indeed, the School System had never funded an intensive Lovaas style ABA program, despite the dramatic difference in results between such a program and the standard School System program: under the strongest evidence offered by the School System, only 14% of autistic children receiving only the School System program went on to become "indistinguishable" from the children in regular education classrooms. School System representatives even acknowledged the effectiveness of Zachary's ABA program: one representative told the Deals that there were things she wished she could recommend for Zachary but then she would have to give them to everyone. The ALJ found that the School System should, at the very least, have informed the Deals about the Lovaas style of ABA and explained why it would recommend against such a program.

[5]The School System methodology, described as an "eclectic" approach, involved the use of various components from other methodologies, primarily Treatment and Education of Autistic and Related Communication Handicapped Children ("TEACCH"). In his factual findings, the ALJ found TEACCH to be "a cradle to grave support system based on the assumption that the core clinical problems in autism are lifelong." The ALJ found TEACCH, a less expensive program than Lovaas style ABA, to be "a humane and effective methodology for addressing the needs of older autistic children and younger autistic children who have not shown or who are incapable of making the progress and IQ gains demonstrated by Lovaas style ABA." The ALJ credited the expert testimony of Dr. James A. Mulick, who stated that, out of almost 2,000 autistic children he had evaluated, the only ones he had seen who had become "indistinguishable" in a regular education setting were those who received intensive Lovaas style ABA.

[6]The ALJ described the "remarkable" progress that Zachary had achieved through the Lovaas style ABA and found that the continuation of such a program was appropriate because any other methodology would actually retard his education or development.

(10)    The School System had mishandled its obligation to provide the related services of physical therapy, occupational therapy, and speech therapy to Zachary and therefore was required to reimburse the Deals for any out of pocket costs they had incurred in providing such related services to Zachary.

(11)    The Deals have no right to veto competent providers of services called for in a properly constituted IEP.

(12)    Zachary Deal was the prevailing party.

On October 1, 2001, the Deals initiated review of portions of the ALJ's decision in the district court. They sought reimbursement of certain expenses that the ALJ had declined to award, as well as attorney's fees for the administrative hearing. The School System filed a counterclaim seeking reversal of the ALJ's determinations that the failure to offer Zachary a "Lovaas style" program violated Zachary's right to a FAPE and that the Deals were entitled to reimbursement for privately obtained related services.

On May 30, 2002, the School System requested that the district court hear additional evidence pursuant to the IDEA's "additional evidence" provision, 20 U.S.C. § 1415(i)(2)(B)(ii). By opinion and order dated August 16, 2002, the district court granted the School System's request to discovery and/or submit testimony from 11 witnesses, including 4 expert witnesses who had not testified before the ALJ and who had had no dealings with the School System or Zachary until after the ALJ rendered his decision. The district court permitted discovery of the testimony of four additional witnesses who were able to provide knowledge of Zachary gained subsequent to the administrative hearing and three witnesses who had testified before the ALJ, though it cautioned the School System that it would only hear evidence limited to the issue before the court–whether the IEP proposed for the 1999-2000 school year was reasonably calculated to lead to educational benefits. The School System also received permission to submit Zachary's complete educational records as well as the complete records of Dr. Susan Speraw, the Deals' expert.

After a series of nationwide depositions and substantial additional document discovery conducted by the School System, the "additional evidence" trial was held on January 23 and 24, 2003. The district court heard testimony from two School System lay witnesses and four expert witnesses and received 24 exhibits into evidence. The Deals did not offer any additional evidence, despite the district court having indicated that they would be permitted to do so.

In an opinion and order dated March 4, 2003, the district court reversed in part and affirmed in part the ALJ's decision. The court ruled that there had been no procedural or substantive violations of the IDEA and that the Deals were not entitled to any reimbursement relief. The district court held that the ALJ had erred in exalting the Deals' preferred educational methodology above other appropriate methods. This appeal followed. Plaintiffs-Appellants argue that the district court erred by (1) allowing and relying upon Defendant-Appellee's additional evidence; (2) failing to take judicial notice of federal court filings challenging the credibility of one of Defendant-Appellee's experts; (3) reversing those aspects of the ALJ's decision that found violations of the IDEA and granted reimbursement to Plaintiffs-Appellants; and (4) awarding costs to Defendant-Appellee.

## II.  STANDARD OF REVIEW

In an IDEA action, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). The Supreme Court has construed this provision to mean that an initial reviewing court should make an independent decision based on the preponderance of the evidence but also should give "due weight" to the determinations made during the state administrative process. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). Although reviewing courts must not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe ex rel. Doe v.*

*Metropolitan Nashville Public Schools*, 133 F.3d 384, 387 (6th Cir. 1998), neither may they "substitute their own notions of sound educational policy for those of the school authorities which they review," *Thomas v. Cincinnati Board of Education*, 918 F.2d 618, 624 (6th Cir. 1990) (quoting *Rowley*, 458 U.S. at 206). The amount of weight due to administrative findings depends on whether the finding is based on educational expertise. *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation." *Id.* "More weight, however, is due to an agency's determinations on matters for which educational expertise is relevant." *Id.*

According to this "modified de novo" standard of review, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). This Court, in turn, applies a clearly erroneous standard of review to the district court's findings of fact and a de novo standard of review to its conclusions of law. *Id.* Mixed questions of law and fact, including the question of whether a child was denied a FAPE, are reviewed de novo. *Id.* at 766 (citing *Tucker v. Calloway County Bd. of Educ.*, 136 F.3d 495, 503 (6th Cir. 1998), and *W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484 (9th Cir. 1992)). This Court also must accord due deference to the state administrative hearing officer's decision. *McLaughlin*, 320 F.3d at 669.

A district court's decision regarding additional evidence in an IDEA case will be reviewed for abuse of discretion. *Knable*, 238 F.3d at 772 (citing *Metro. Gov't v. Cook*, 915 F.2d 232, 234 (6th Cir. 1990)). A district court's refusal to take judicial notice likewise will be reviewed for abuse of discretion. *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002). An award of costs to a prevailing party also is considered under an abuse of discretion standard. *Jefferson v. Jefferson County Pub. Sch. Sys.*, 360 F.3d 583, 591 (6th Cir. 2004).

## III. DISCUSSION

### A. Additional Evidence

This Court has taken an expansive view of the scope of additional evidence that may supplement the administrative record. *See, e.g., Metro. Bd. of Pub. Educ., Metro. Gov't v. Guest ex rel. Guest*, 193 F.3d 457, 463 (6th Cir. 1999); *Cook*, 915 F.2d at 234. This Court has declined to adopt the narrow position of other circuits "that additional evidence is admissible only in limited circumstances, such as to supplement or fill in the gaps in the evidence previously introduced." *Cook*, 915 F.2d at 234 (rejecting central holding of *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773 (1st Cir. 1984), *aff'd on other grounds*, 471 U.S. 359 (1985)). Rather, "'[a]dditional,' in its ordinary usage, implies something that is added, or something that exists by way of addition. To 'add' means to join or unite; the limitation on what can be joined inherent in the term 'supplement' is not present in the term 'add.'" *Id.* While the determination of which additional evidence to allow rests within the sound discretion of the district court, *Knable*, 238 F.3d at 772, the court should take care to limit additional evidence to what is necessary for consideration of whether the original IEP was reasonably calculated to afford some educational benefit. *Guest*, 193 F.3d at 463 (finding that the district court exceeded its jurisdiction to the extent it used additional evidence to rule upon issues beyond those presented to the ALJ).

Here, Plaintiffs-Appellants have not given this Court any basis for concluding that the district court abused its discretion in permitting (1) the testimony of four additional expert witnesses who addressed the Lovaas study and accepted principles for educating autistic students; (2) the testimony of two additional fact witnesses who had worked with Zachary in the 2001-2002 school year, limited in scope to the extent to which their observations were relevant to the challenged decisions for the 1999-2000 school year; or (3) the introduction of new documentary evidence, consisting of the *curricula vitae* of the expert witnesses who testified, records regarding Zachary's educational progress, and the results of psychological evaluations

conducted by certain experts.  There is no evidence, for example, that the district court used the additional evidence to go beyond the scope of the matters before the ALJ; indeed, the district court took great care to limit testimony to matters relevant to the 1999-2000 IEP.

Plaintiffs' main argument seems to be that, under the *Burlington* factors, the allowance of so much additional evidence was simply unfair.  This Court, however, has rejected the narrowness of the *Burlington* analysis, choosing instead to give great latitude to district courts, and has recognized that additional expert testimony, in particular, might be especially helpful to district courts.[7]  *Cook*, 915 F.2d at 234.  There is no prohibition, in either the statute or the case law of this Circuit, against the district court allowing even a large amount of additional evidence if it will add something to the administrative record or assist the court in deciding the issues before it.[8]  *See* 20 U.S.C. § 1415(i)(2)(B) (stating that the district court "shall hear additional evidence at the request of a party").  This Court therefore **AFFIRMS** the district court's allowance of additional evidence.

Plaintiffs-Appellants also contend that the district court failed to exercise its "gatekeeper" function under *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), by allowing allegedly unreliable expert testimony.  In particular, Plaintiffs-Appellants attack the district court's failure to exclude the "plainly erroneous" testimony of Dr. David Rostetter and the "after-the-fact" testimony of Dr. B.J. Freeman.  Plaintiffs-Appellants provide no legal arguments, however, and instead argue facts going to the witnesses' credibility:  they contend that the district court gave undue weight to the testimony of Dr. Rostetter and, to a lesser extent, Dr. Freeman.  *But see Daubert,* 509 U.S. at 596 ("Vigorous cross-examination [and] presentation of contrary evidence . . . are the traditional and appropriate means of attacking shaky but admissible evidence.").

In *Daubert*, the Supreme Court held that district courts must act as "gatekeepers" to protect juries from misleading or unreliable expert testimony by assessing the reliability of the expert's principles and methodologies used to reach the expert opinion or conclusion.  *Daubert*, 509 U.S. at 589, 592-93.  Factors to be considered in assessing reliability include whether the expert's theory may be tested or refuted, the degree of acceptance of the theory or technique within the relevant community, and whether the theory has been a subject of peer review or publication.  *Id.* at 593-94.

The problems with Plaintiffs-Appellants' argument are manifold.  The "gatekeeper" doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial.  Furthermore, this Court is not in the business of dictating to district courts the amount of weight they must give to certain expert opinions.  Plaintiffs-Appellants simply have not demonstrated either that the district court abused its discretion by hearing this testimony, *General Electric Co. v. Joiner*, 522 U.S. 136, 138-39 (1997), or that any of the district court's factual findings based upon these expert opinions were clearly erroneous, *Knable*, 238 F.3d at 764.[9]  Even if this Court were to analyze the admissibility of Dr. Rostetter's and Dr. Freeman's

---

[7]Plaintiffs-Appellants cite to *Knable*, where this Court upheld a district court's refusal to allow into evidence the deposition testimony of a psychologist in part because the testimony was developed after the administrative hearing.  *Knable*, 238 F.3d at 771-72.  What Plaintiffs-Appellants do not mention is that the district court in *Knable* had also found the proffered testimony to be duplicative of evidence presented at the administrative hearing, *id.* at 771, whereas here, the district court took pains to avoid repetitive testimony.  Regardless, *Knable* does not control this case because the Court in *Knable* merely held that the district court had not abused its discretion.  *Id.* at 772.

[8]A district court could, of course, be found to have abused its discretion if it allowed additional evidence "to change the character [of] the hearing from one of review to a trial *de novo*" or if, for example, one party unfairly reserved its best evidence for trial.  *Cook*, 915 F.2d at 234-35 (quoting *Burlington*, 736 F.2d at 791).  There is no evidence, however, that such was the case here.

[9]Indeed, Plaintiffs-Appellants are not able to point to any real reliance by the district court on the opinions of these experts.  Dr. Rostetter, for example, is mentioned only once in the district court's opinion.  Plaintiffs-Appellants express particular concern that the district court relied on and applied the "unprecedented and impermissibly low standard" articulated by Dr. Rostetter.

testimony under the *Daubert* factors, the testimony readily would meet the threshold for admissibility. Dr. Rostetter is a nationally recognized expert in the field of IDEA compliance who has published and presented extensively in the field, who assisted in drafting the original IDEA regulations, and who has served as a court appointed and court approved expert in numerous IDEA cases throughout the country. With respect to Dr. Freeman, the mere fact that she was not involved in the case until after the ALJ's decision was entered is not determinative on the issue of the admissibility of her testimony. *See, e.g., Guest*, 193 F.3d at 463 (finding after the fact evidence to be admissible in IDEA cases as long as it is helpful in determining the validity of the original IEP). In sum, this Court will not disturb the district court's decision to admit the testimony of the School System's experts.

## B.  Judicial Notice

Plaintiffs-Appellants sought to have the district court take judicial notice, pursuant to Federal Rule of Evidence 201,[10] of declarations filed by Dr. Rostetter in an unrelated California case that allegedly "strongly suggest that the positions Dr. Rostetter advances can turn on which party is paying his bill." Defendant-Appellee argues that Plaintiffs-Appellants confuse a district court's determination of a witness's credibility with judicial notice of adjudicative facts.

In *United States v. Bonds*, 12 F.3d 540 (6th Cir. 1993), this Court refused to take judicial notice of a National Research Committee report:

> While defendants' request that we merely take judicial notice of this report pursuant to Federal Rules of Evidence 201(f) and 104(a) has a certain facial appeal, Federal Rule 201 permits a court to take judicial notice only of facts "not subject to reasonable dispute . . . ." Fed. R. Evid. 201(b). There is no dispute that the [report] exists, but there is considerable dispute over the significance of its contents.

*Bonds*, 12 F.3d at 553 (footnotes omitted); *see also United States v. Collier*, 68 Fed. App. 676, 2003 U.S. App. LEXIS 13629, at \*16 (6th Cir. July 2, 2003) (finding no error in district court's refusal to take judicial notice of bankruptcy court judgment beyond acknowledgment that proceeding had occurred), *cert. denied*, 124 S.Ct. 1094 (2004).

Here, too, there is no dispute that the California proceeding occurred or that the declarations in that case existed. The Deals, however, essentially were attempting to get the district court to take judicial notice of Dr. Rostetter's lack of credibility, a fact that is very much in dispute. The proper use of the allegedly contradictory declarations was in cross-examination of Dr. Rostetter, and, indeed, Plaintiffs-Appellants did

---

According to the Deals, Dr. Rostetter urged the district court to assess the School System's conduct based on "standards of acceptable practice," *i.e.*, what other school districts do. There is no evidence, however, that the district court utilized any such standard.

[10]Federal Rule of Evidence 201 reads, in pertinent part, as follows:

> **(a) Scope of rule.**  This rule governs only judicial notice of adjudicative facts.
> **(b) Kinds of facts.**  A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
>  . . . .
> **(d) When mandatory.**  A court shall take judicial notice if requested by a party and supplied with the necessary information.

Although Rule 201 is phrased in mandatory language, courts of appeals review a district court's refusal to take judicial notice for abuse of discretion. *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 349 (6th Cir. 2002).

cross-examine Dr. Rostetter about the California litigation. There was no abuse of discretion in the district court's refusal to take judicial notice of the declarations. That decision therefore is **AFFIRMED**.

## C. Violations of the IDEA

### 1. Standards Under the IDEA

The purpose of the IDEA is to give children with disabilities a free appropriate public education designed to meet their unique needs.[11] *Burilovich ex rel. Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.*, 208 F.3d 560, 565 (6th Cir. 2000) (citing 20 U.S.C. §§ 1401(25), 1412). As part of providing a FAPE, school districts receiving funds under the IDEA are required to establish an IEP for each child with a disability. *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 762 (6th Cir. 2001) (citing 20 U.S.C. § 1414(a)(5)). The IEP must "contain a specific statement of the child's current performance levels, the child's short-term and long-term goals, the educational and other services to be provided, and criteria for evaluating the child's progress." *Id.* at 763 (citing 20 U.S.C. § 1401(a)(20)).

There are two parts to a court's inquiry in suits brought pursuant to the IDEA. First, the court must determine whether the school system has complied with the procedures set forth in the IDEA. *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). Second, the court must assess whether the IEP developed through those procedures was reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206-07; *McLaughlin*, 320 F.3d at 669. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 207; *accord Kings Local Sch. Dist., Bd. of Educ. v. Zelazny*, 325 F.3d 724, 729 (6th Cir. 2003). Parties challenging an IEP have the burden of proving by a preponderance of the evidence that the IEP devised by the school district is inappropriate. *Zelazny*, 325 F.3d at 729; *Dong ex rel. Dong v. Bd. of Educ. of the Rochester Cmty. Sch.*, 197 F.3d 793, 799 (6th Cir. 1999).

With regard to procedural matters, a court should "strictly review an IEP for procedural compliance," although technical deviations will not render an IEP invalid. *Dong*, 197 F.3d at 800; *see Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss ex rel. Boss*, 144 F.3d 391, 398 (6th Cir. 1998) (noting that "minor technical violations may be excused"). A finding of procedural violations does not necessarily entitle appellants to relief. *Knable*, 238 F.3d at 764. Only if a procedural violation has resulted in substantive harm, and thus constitutes a denial of a FAPE, may relief be granted. *Id.* The Supreme Court has emphasized the importance Congress attached to the IDEA's procedural safeguards:

> [T]he congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the

---

[11]The term "free appropriate public education" is defined in the IDEA as follows:

> The term "free appropriate public education" means special education and related services that–
> **(A)** have been provided at public expense, under public supervision and direction, and without charge;
> **(B)** meet the standards of the State educational agency;
> **(C)** include an appropriate preschool, elementary, or secondary school education in the State involved; and
> **(D)** are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8). According to the Supreme Court, a FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188-89 (1982).

> legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.

*Rowley*, 458 U.S. at 206. "If the procedural requirements of the IDEA are met, greater deference is to be afforded to the district's placement decision." *Dong*, 197 F.3d at 800.

As for substantive compliance, "[t]he 'preponderance of the evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990) (quoting *Rowley*, 458 U.S. at 206). The Supreme Court has cautioned,

> In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.

*Rowley*, 458 U.S. at 207 (footnote omitted). "Indeed, federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the factfinding of a state agency, which is presumed to have expertise in the field." *Burilovich*, 208 F.3d at 566.

The Supreme Court has spoken on the level of education that the states are required to provide to disabled children:

> Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. . . . We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.

*Rowley*, 458 U.S. at 200-01. The Court explicitly rejected the argument that school districts are required to provide services "sufficient to maximize each child's potential commensurate with the opportunity provided other children." *Id.* at 198 (internal citation omitted) (finding no congressional intent to achieve strict equality of opportunity or services); *see Renner v. Bd. of Educ. of the Pub. Sch.*, 185 F.3d 635, 644 (6th Cir. 1999).

Parents may receive retroactive reimbursement for private educational services they unilaterally provide to their child in certain circumstances. *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985); *Knable*, 238 F.3d at 763. Parents are entitled to such reimbursement if a court concludes both that the public placement violated the IDEA and that the private placement was proper under the IDEA. *Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993); *Knable*, 238 F.3d at 763. A private placement is proper under the IDEA if the education provided in the private placement is reasonably calculated to enable the child to receive educational benefits. *Knable*, 238 F.3d at 770 (citing *Florence County*, 510 U.S. at 11).

## 2. Procedural Violations

### a. Predetermination

The ALJ found that the School System "clearly" had an unofficial policy of refusing to consider Lovaas style ABA for autistic children and that School System personnel consistently attended IEP meetings having "pre-selected" the extant School System program regardless of Zachary's demonstrated individual needs. The ALJ's conclusion of predetermination was based on the following findings of fact:

24.    Ms. Jane Dixon, an HCDE Special Education Supervisor, met with Mrs. Deal on May 19, 1997 and at the meeting she discussed programs available for autistic children without mentioning the Lovaas style ABA as a methodology for the parents to explore.

. . . .

56.    At the May 11, 1998 IEP meeting, Sandra Jerardi told the Deals that there were certain things she would like to give (Zachary) but that she could not because she could not give the same service to everybody.

. . . .

63.    The HCDE has consistently rejected providing Lovaas style ABA services to Zachary or any other student in their system. . . .

. . . .

85.    HCDE rejects the validity of the Lovaas study and its results and embraces the position of the professionals in the field who have published articles critical of the Lovaas style ABA approach to treating children with autism.

. . . .

105.    Jane Dixon told the Deals that they could not ask questions during the March 3, 1999 IEP meeting.

. . . .

111.    Ms. Dixon investigated Zachary's parents' dispute with the IEP and interviewed various teachers and providers without interviewing any of the ABA providers even though Lovaas style ABA formed the bulk of Zachary's educational program at that time.

112.    HCDE denied the Deal's request for Lovaas style ABA for Zachary in part because HCDE believes it is more expensive than HCDE's current approach.

. . . .

126.    *Prior* to the Deals requesting funding for Zachary's ABA program from the HCDE, Ms. Sandra Jerardi authored an internal memo in which she described Zachary's program under IDEA as a "sensitive case with regards to school program and/or Lovaas."

127.    Based on other testimony in the record supporting the proposition that the HCDE rejects meaningful consideration of the Lovaas style ABA intervention at least in large part because of its perceived cost, the court finds that Ms. Jerardi was flagging Zachary Deal's education program as sensitive because of its probable cost and adverse impact on the HCDE policy of rejecting any and all requests for Lovaas style ABA for young autistic children.

128.    At the May 11, 1998 IEP meeting, the Deals outlined the impressive results Zachary had achieved with the Lovaas style ABA methodology and asked the HCDE to fund a continuation of the program over the summer.

129.    HCDE personnel informed the Deals that "the powers that be" were not implementing ABA programs.

130.    Ms. Jerardi, an HCDE representative and IEP team member in the May 11, 1998 IEP team meeting told the Deals that she wished people would pay their taxes so that HCDE could provide ABA for Zachary.

. . . .

156.    Jane Dixon believes that the parents' proposed goal to make Zachary independent in society with as normal a life as possible is unrealistic.

157.    HCDE has a policy of not considering Lovaas style ABA for autistic children. Sandra Jerardi admits to being impressed by Zachary's present levels of performance yet steadfastly refuses to give any credit to Zachary's intensive Lovaas style ABA program for these achievements. Ms. Jerardi refuses to concede that any progress is attributable to the ABA program even when the progress was obtained over the course of a summer in which the school system provided no services.

. . . .

174.    HCDE refused the Deal's offer to help train HCDE personnel on Zachary's ABA program and protocols.

J.A. at 37-49 (citations to administrative hearing record omitted).[12]

The district court did not explicitly reject any of the ALJ's findings of fact on the issue of predetermination. Relying on *Ms. C. ex rel. N.L. v. Knox County Schools*, 315 F.3d 688 (6th Cir. 2003), the court simply concluded that "[t]he facts of this case do not add up to predetermination on the part of

---

[12]The Deals point to two additional pieces of evidence that they claim support a finding of predetermination. First, Donna Palmer, a School System psychologist, testified at the administrative hearing regarding her familiarity with a publication entitled, "How to Avoid Parents' Demands for Lovaas." Second, a letter from the School System's counsel regarding, *inter alia*, the representation in the Deals' administrative hearing stated, "I previously briefed the Board in executive session regarding this litigation and its importance to the system and received its backing in our proposal to defend this litigation vigorously." The Deals contend that this statement is compelling evidence that the School System is being driven by its fear of this case setting a precedent that will require it to provide similar ABA services to other autistic children.

HCDE." The court found persuasive the fact that the Deals were present at every IEP meeting convened and at every meeting took the opportunity "to forcefully advocate their position." The court stated,

> HCDE could come to IEP meetings with pre-formed opinions regarding the best course of action for Zachary so long as school officials were willing to listen to the Deals, and the Deals had the opportunity to make objections and suggestions. . . . There is nothing in IDEA which requires school systems to accept the parents' point of view, or suffer a procedural violation of the statute.

This Court's review of the predetermination decision is de novo, since it is a mixed question of law and fact. *See Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 766 (6th Cir. 2001). The evidence reveals that the School System, and its representatives, had pre-decided not to offer Zachary intensive ABA services regardless of any evidence concerning Zachary's individual needs and the effectiveness of his private program. This predetermination amounted to a procedural violation of the IDEA. Because it effectively deprived Zachary's parents of meaningful participation in the IEP process, the predetermination caused substantive harm and therefore deprived Zachary of a FAPE.

The leading case on predetermination is *Spielberg ex rel. Spielberg v. Henrico County Public Schools*, 853 F.2d 256 (4th Cir. 1988). There, the district court had concluded, based on a series of letters written before the IEP meeting that focused on a change in placement, that the school district had decided to change the disabled student's placement before developing an IEP to support the change. *Id.* at 258-59. The Fourth Circuit affirmed the district court's determination that a procedural violation had occurred that deprived the student of a FAPE:

> Under the EHA [the predecessor to the IDEA], the general rule is that placement should be based on the IEP. 34 C.F.R. § 300.552. The appendix interpreting the EHA regulations states that "IEP objectives must be written before placement." 34 C.F.R. Part 300, App. C., Question 42. The decision to place Jonathan at Randolph before developing an IEP on which to base that placement violates this regulation as interpreted by the Secretary of Education. It also violates the spirit and intent of the EHA, which emphasizes parental involvement. After the fact involvement is not enough.

*Id.* at 259 (footnote omitted). The relevant regulation provides that, in determining the educational placement of a disabled child, the public agency must ensure that the placement "[i]s based on the child's IEP." 34 C.F.R. § 300.552.

*W.G. v. Board of Trustees of Target Range School District No. 23*, 960 F.2d 1479 (9th Cir. 1992), was a similar case. There, the Ninth Circuit agreed with the district court that the school district had independently developed a proposed IEP that would place the student in a preexisting, predetermined program. *Id.* at 1484. At the IEP meeting, no alternatives to that program were considered. *Id.* The court held that in order to fulfill the goal of parental participation in the IEP process, the school district was required to conduct, not just an IEP meeting, but a *meaningful* IEP meeting. *Id.* at 1485.

Courts often have declined to find predetermination; however, such cases are distinguishable from the case sub judice. *See, e.g., Knox County Sch.*, 315 F.3d at 694-95 (finding no predetermination where parent was not involved in initial, ex parte determination of eligibility but was active participant in final determination); *Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1036 (3d Cir. 1993) (finding parents had opportunity to participate in IEP formulation in meaningful way); *Hanson ex rel. Hanson v. Smith*, 212 F. Supp. 2d 474, 486 (D. Md. 2002) (noting credible evidence that school board came to IEP meetings with open mind, and that several options were discussed and considered before final recommendation was made); *Doyle v. Arlington County Sch. Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992)

(holding that school system had merely proposed a placement before IEP was completed and had not "fully made up its mind before the parents ever [got] involved," thereby denying the parents "the opportunity for meaningful input"), *aff'd*, 39 F.3d 1176 (4th Cir. 1994). In *Knox County Schools*, this Court emphasized that school officials are permitted to form opinions and compile reports prior to IEP meetings. *Knox County Sch.*, 315 F.3d at 693-94 n.3. The Court cautioned, however, that such conduct is only harmless as long as school officials are "willing to listen to the parents." *Id.* at 694-95 (noting that school system representatives should "come to the meeting with suggestions and open minds, not a required course of action").

The facts of this case strongly suggest that the School System had an unofficial policy of refusing to provide one-on-one ABA programs and that School System personnel thus did not have open minds and were not willing to consider the provision of such a program. This conclusion is bolstered by evidence that the School System steadfastly refused even to discuss the possibility of providing an ABA program, even in the face of impressive results. Indeed, School System personnel openly admired and were impressed with Zachary's performance (presumably attained through the ABA program), until the Deals asked the School System to pay for the ABA program.[13] Several comments made by School System personnel suggested that they would like to provide Zachary with ABA services, *i.e.*, they recognized the efficacy of such a program, but they were prevented from doing so, *i.e.*, by the School System policy. The clear implication is that no matter how strong the evidence presented by the Deals, the School System still would have refused to provide the services. This is predetermination.

The district court erred in assuming that merely because the Deals were present and spoke at the various IEP meetings, they were afforded adequate opportunity to participate. Participation must be more than a mere form; it must be *meaningful*. *W.G.*, 960 F.2d at 1485; *see also Knox County Sch.*, 315 F.3d at 694-95 (stating that school officials must be willing to listen to the parents and must have open minds). Despite the protestations of the Deals, the School System never even treated a one-on-one ABA program as a viable option. Where there was no way that anything the Deals said, or any data the Deals produced, could have changed the School System's determination of appropriate services, their participation was no more than after the fact involvement. *See Spielberg*, 853 F.2d at 259.

The School System noted, at oral argument, that the Deals' participation in the IEP process is evidenced by their contributions to the descriptions of Zachary's present levels of performance and to the stated goals and objectives contained within the IEPs. The School System was unable to point to any evidence, however, that the Deals contributed to the operative portions of the IEP–that their opinions were considered in determining the services that would be provided to Zachary. In short, nothing offered by the School System suffices to surmount the Golconda of circumstantial evidence adduced by Plaintiffs-Appellants to establish the existence of an unofficial School System policy of rejecting any requests for an intensive, one-on-one ABA program. This evidence includes the internal memorandum by Sandra Jerardi flagging Zachary's education program as a "sensitive case with regards to school program and/or Lovaas," as well as various comments from School System personnel, including a statement that "the powers that be" were not funding ABA programs.

The School System seemed to suggest, at oral argument, that it is entitled to invest in a program such as TEACCH and then capitalize on that investment by using the TEACCH program exclusively. But this is precisely what it is *not* permitted to do, at least without fully considering the individual needs of each child. A school district unquestionably may consider cost in determining appropriate services for a child. *E.g., Clevenger v. Oak Ridge Sch. Bd.*, 744 F.2d 514, 516-17 (6th Cir. 1984). The school district is required,

---

[13]As discussed in depth by the ALJ, the Deals' preference for the CARD program over the School System program was not the result of a mere dispute over educational methodology but, rather, was based on extensive data regarding Zachary's progress under the CARD program. Zachary exhibited significant IQ gains, as well as practical improvement in daily tasks. One of the School System's experts, Dr. Taubman, testified before the district court that after reviewing numerous boxes of data on Zachary's progress, he was unable to point to a single error or inaccuracy.

however, to base its placement decision on the child's IEP, 34 C.F.R. § 300.552, rather than on the mere fact of a pre-existing investment. In other words, the school district may not, as it appears happened here, decide that because it has spent a lot of money on a program, that program is always going to be appropriate for educating children with a specific disability, *regardless of any evidence to the contrary of the individualized needs of a particular child.* A placement decision may only be considered to have been based on the child's IEP when the child's individual characteristics, including demonstrated response to particular types of educational programs, are taken into account. *See Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 177 (3d Cir. 1988) (noting that the "system of procedural protection only works if the state devises an *individualized* program and is willing to address the handicapped child's 'unique needs'") (quoting 20 U.S.C. § 1401(16)). A "one size fits all" approach to special education will not be countenanced by the IDEA.

A procedural violation can cause substantive harm when it seriously infringes upon the parents' opportunity to participate in the IEP process. *Knable*, 238 F.3d at 765; *see also Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 208 (1982) ("Congress sought to protect individual children by providing for parental involvement . . . in the formulation of the child's individual educational program."). Because the School System deprived the Deals of a meaningful opportunity to participate, the predetermination amounts to denial of a FAPE for Zachary. The Court accordingly **REVERSES** the district court's decision on this basis.

### b. Presence of Regular Education Teachers at IEP Meetings

The ALJ found (1) that no regular education teacher attended the February 19, 1999, IEP meeting; (2) that no regular education teacher *of Zachary's* attended the October 15, 1998, IEP team meeting "even though it was clear that whether or not it would be appropriate for Zachary to participate in the regular education setting would be a subject of the meeting"; (3) that the regular education teacher who attended the August 25, 1999, meeting left before the 1999-2000 goals and objectives were developed and before the issue of placement was decided; and (4) that no regular education teacher attended the August 20, 1999, IEP meeting. The ALJ found that the failure of the School System to have regular education teachers attend the IEP meetings was a "troubling procedural violation," as well as "strong evidence that the decision to place Zachary in a special education classroom for the 1999-2000 school year had been made before the IEP team convened."

The district court erroneously stated that "the ALJ's findings only catalog two IEP meetings (October 1998 and February 1999) where a regular school teacher was not present." The district court then explained that the absence of a regular school teacher at these two meetings did not cause substantive harm to Zachary or his parents and thus did not deny Zachary a FAPE:

> In October 1998, Zachary was four years old. He would not have been attending regular school during the 1998-1999 school year because he had not reached age five. It is difficult to see what meaningful contribution a regular school teacher could have made to this meeting. The February 1999 IEP meeting was held at a time when the IEP for the 1999-2000 school year had long been formulated, and during a time when Zachary was not even attending an HCDE school. Again, it risks stating the obvious to conclude that this had no effect on the welfare of Zachary or the Deals.

A school district is required to "ensure that the IEP team for each child with a disability includes . . . [a]t least one regular education teacher of the child (if the child is, or may be, participating in the regular education environment)." 34 C.F.R. § 300.344(a). There appears to be no dispute that the School System technically violated the IDEA by failing to include regular education teachers at certain IEP meetings. The question is whether these violations caused substantive harm to either Zachary or his parents. There is little

case law directly on point.[14]   The Supreme Court clearly recognized the importance of the IDEA's procedural requirements in ensuring that a disabled student receives a FAPE. *See Rowley*, 458 U.S. at 206 ("[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."). The Court is mindful, however, that mere "technical deviations" do not render an IEP invalid. *Dong*, 197 F.3d at 800.

The district court unaccountably failed to consider the violations relating to the two August 1999 meetings–the meetings at which the 1999-2000 IEP that is the subject of this lawsuit was prepared. The Court agrees that the School System's failure to ensure the attendance of regular education teachers at the October 1998 and February 1999 meetings did not cause substantive harm. The very purpose of this requirement is implicated, however, by the August 1999 failures. The rationale for requiring the attendance of a regular education teacher is closely tied to Congress's "least restrictive environment" mandate. The input provided by a regular education teacher is vitally important in considering the extent to which a disabled student may be integrated into a regular education classroom and how the student's individual needs might be met within that classroom. One of the Deals' main objections to the 1999-2000 IEP developed for Zachary is that it did not provide for sufficient integration. The absence of the unique perspective that could have been provided by a regular education teacher therefore had a real impact on the decision-making process.[15]   The Court therefore **REVERSES** the district court's decision based on this procedural violation, as well.

### 3. Substantive Violations

The ALJ held that the School System had denied Zachary a FAPE by offering its standard, "eclectic" program for teaching autistic children rather than 30 hours per week of "Lovaas style ABA." The ALJ cited to extensive evidence tending to suggest that the approach offered by the School System provides little or no chance of self-sufficiency for an autistic child while, under the Lovaas approach, self-sufficiency is a real possibility. The district court found that it could not conclude that the private school placement and ABA services provided by the Deals were inappropriate, but that the proper focus was on the program offered by the School System. The court determined that there are a number of effective ways to deal with autism, and that the School System's program utilized an acceptable methodology.

Defendant-Appellant argues that the ALJ improperly shifted the burden of proof by requiring it to prove that its program was better than what was provided by the Deals and that the ALJ misapprehended the Lovaas study and failed to comprehend that the School System's program was consistent with best practices in the field.

The district court had the benefit of testimony from four experts offered by the School System to correct the ALJ's alleged misapprehensions. As a result, the ALJ and the district court ultimately took different views of the facts. Their respective opinions, however, evince a fundamental legal disagreement regarding the level of education that must be provided to a disabled child.

The facile answer to the question raised by this disagreement is that a school district is only required to provide educational programming that is reasonably calculated to enable the child to derive more than *de minimis* educational benefit. *Doe ex rel. Doe v. Smith*, 879 F.2d 1340, 1341 (6th Cir. 1989). This Court and others faced with essentially the same question have decided that school systems are not required to

---

[14]In *W.G. v. Board of Trustees of Target Range School District No. 23*, 960 F.2d 1479, 1484-85 (9th Cir. 1992), the court pointed to the school district's failure to obtain any input or participation from the student's regular classroom teacher as one aspect of the school district's serious procedural violations.

[15]Defendant-Appellant's argument that the school principal and others familiar with the regular education program were present at these meetings misses the mark. The regulation explicitly requires the attendance of a "regular education teacher of the child." 34 C.F.R. § 300.344(a). The regulation does not state an exception where other knowledgeable people are present.

provide autistic children with the sort of intensive (and expensive) educational program pioneered by Dr. Lovaas. *Burilovich ex rel Burilovich v. Bd. of Educ. of the Lincoln Consol. Sch.*, 208 F.3d 560 (6th Cir. 2000) ("Lovaas-style" discrete trial training vs. mainstream kindergarten); *Dong ex rel. Dong v. Bd. of Educ. of the Rochester Cmty. Sch.*, 197 F.3d 793 (6th Cir. 1999) ("Lovaas intervention method" vs. TEACCH); *Adams ex rel. Adams v. Oregon*, 195 F.3d 1141 (9th Cir. 1999) (early intervention services consisting of 40 hours per week of "Lovaas-type discrete trial training" vs. 12.5 hour school program incorporating that and other methodologies); *Renner v. Bd. of Educ. of the Pub. Sch.*, 185 F.3d 635 (6th Cir. 1999) (40 hours per week of one-on-one discrete trial training vs. school based program including some discrete trial training); *Popson ex rel. J.P. v. W. Clark Cmty. Sch.*, 230 F. Supp. 2d 910 (S.D. Ind. 2002) (Lovaas based "ABA/DTT program" vs. "eclectic approach").

At some point, however, this facile answer becomes insufficient. Indeed, there is a point at which the difference in outcomes between two methods can be so great that provision of the lesser program could amount to denial of a FAPE. A school district clearly is not required to "maximize each child's potential commensurate with the opportunity provided other children," *Rowley*, 458 U.S. at 198 (internal citation omitted), *i.e.*, to provide all children with equal educational opportunity. The Third Circuit, however, has held that an IEP must confer a "*meaningful* educational benefit." *T.R. ex rel. N.R. v. Kingwood Township Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (citing *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 182 (3d Cir. 1988), and *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999)). Further, that benefit "must be gauged in relation to a child's potential." *Kingwood*, 205 F.3d at 578 (quoting *Ridgewood*, 172 F.3d at 247). Based on the analysis set forth below, we agree that the IDEA requires an IEP to confer a "meaningful educational benefit" gauged in relation to the potential of the child at issue.

In *Polk*, the issue was the provision of physical therapy as a "related service." Rather than providing direct physical therapy from a licensed physical therapist, the school district shifted to a "consultative" model whereby a physical therapist did not provide any therapy directly, but instead trained the classroom teacher to integrate physical therapy with the disabled student's education. *Polk*, 853 F.2d at 173-74. The parents alleged that the failure to provide direct physical therapy at least once a week had hindered their child's progress in meeting his educational goals. *Id.* at 172. The Third Circuit first held that there was a genuine issue of material fact regarding whether the defendants had failed to provide *individualized* educational programs due to their refusal, as a blanket rule, even to consider providing handicapped students with direct physical therapy from a licensed therapist. *Id.* The court next concluded that the lower court had erred in evaluating the disabled child's educational program by a standard under which even trivial educational advancement could satisfy the substantive requirements of the statute. *Id.*

The court held that a FAPE must provide "more than a trivial educational benefit." *Id.* at 180. Noting that *Rowley* was a narrow decision and that the precise issue of how much educational benefit must be provided had not been squarely before the Court in that case, the *Polk* court relied on *Rowley*'s use of the word "meaningful," as well as legislative history emphasizing the importance of self-sufficiency, to find that the educational benefit must be more than *de minimis*. *Id.* at 179-82 (noting that Congress must have contemplated "significant learning" in special education classrooms). The court chose to read expansively its previous decision in *Board of Education v. Diamond*, 808 F.2d 897, 991 (3d Cir. 1986), in which it had rejected the argument that when the *Rowley* Court referred to "some benefit," it meant any benefit at all, even if the child nevertheless regressed. *Polk* at 183.

Later Third Circuit cases have affirmed that IEPs must be tailored to provide a meaningful benefit. For example, in *Ridgewood*, the court held that a mere finding that an IEP had provided "more than a trivial educational benefit" was insufficient to establish that the IDEA's standards had been met. *Ridgewood*, 172 F.3d at 247-48. The court found that because the benefit provided "must be gauged in relation to a child's potential," *Polk* at 185, the determination of "meaningful benefit" requires "a student-by-student analysis that carefully considers the student's individual abilities." *Ridgewood* at 248. The *Kingwood* court, in turn, emphasized that the educational benefit must be "*meaningful*," and acknowledged that a district court must "analyze the type and amount of learning" of which a student is capable in order to determine how much

of an educational benefit must be provided. *Kingwood*, 205 F.3d at 577-78 (quoting *Ridgewood*, 172 F.3d at 248).

*Rowley* is the only Supreme Court decision to have addressed the level of educational benefit that must be provided pursuant to an IEP. Nothing in *Rowley* precludes the setting of a higher standard than the provision of "some" or "any" educational benefit; indeed, the legislative history cited in *Rowley* provides strong support for a higher standard in a case such as this, where the difference in level of education provided can mean the difference between self-sufficiency and a life of dependence. As noted by the Third Circuit, "*Rowley* was an avowedly narrow opinion that relied significantly on the fact that Amy Rowley progressed successfully from grade to grade in a 'mainstreamed' classroom." *Polk*, 853 F.2d at 180. Since Amy Rowley was receiving passing grades and otherwise succeeding in school, the only question before the Court was whether the school was required to give Amy sufficient assistance to allow her to receive the same educational benefit as her non-disabled peers. The *Rowley* Court did not have occasion to consider the question of what level of educational benefit the school district would have been required to provide Amy Rowley had she not been progressing successfully through school in a regular education classroom.

The Court in *Rowley* rejected the idea that self-sufficiency was the substantive standard that Congress imposed on the states, "[b]ecause many mildly handicapped children will achieve self-sufficiency without state assistance while personal independence for the severely handicapped may be an unreachable goal." *Rowley*, 458 U.S. at 201 n.23. The Court recognized, however, that a key concern of and primary justification for the IDEA's predecessor was the desire to foster self-sufficiency in handicapped children. The Court quotes, for example, the following Senate Report excerpt:

> The long range implications of these statistics are that public agencies and taxpayers will spend billions of dollars over the lifetimes of these individuals to maintain such persons as dependents and in a minimally acceptable lifestyle. With proper education services, many would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such services, would increase their independence, thus reducing their dependence on society.

S. Rep. No. 94-168, at 9 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1425, 1433 (quoted in *Rowley*, 458 U.S. at 201 n.23). The Court also quotes one of the principal Senate sponsors of the legislation stating, "Providing appropriate educational services now means that many of these individuals will be able to become a contributing part of our society, and they will not have to depend on subsistence payments from public funds." *Rowley*, 458 U.S. at 201 n.23 (quoting 121 Cong. Rec. 19492 (1975) (remarks of Sen. Williams)).[16]

---

[16]Similar ideas were expressed in *Polk*:

> The EHA's sponsors stressed the importance of teaching skills that would foster personal independence for two reasons. First, they advocated dignity for handicapped children. Second, they stressed the long-term financial savings of early education and assistance for handicapped children. A chief selling point of the Act was that although it is penny dear, it is pound wise–the expensive individualized assistance early in life, geared toward teaching basic life skills and self-sufficiency, eventually redounds to the benefit of the public fisc as these children grow to become productive citizens. . . .
>      . . . . [T]he emphasis on self-sufficiency indicates in some respect the quantum of benefits the legislators anticipated: they must have envisioned that significant learning would transpire in the special education classroom–enough so that citizens who would otherwise become burdens on the state would be transformed into productive members of society.

*Polk*, 853 F.2d at 181-82.

The current version of the IDEA provides further support for such sentiments. Congress explicitly found that shortcomings of the previous act, the Education for all Handicapped Children Act of 1975, included low expectations for disabled children and "an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." 20 U.S.C. § 1400(a)(4). Congress has declared that the school personnel who work with disabled children should receive high quality professional development in order to provide such personnel with the skills necessary to "ensure that [all disabled children] have the skills and knowledge necessary to enable them . . . to be prepared to lead productive, independent, adult lives, to the maximum extent possible." 20 U.S.C. § 1400(a)(5)(E). Indeed, one of the stated purposes of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs *and prepare them for employment and independent living*." 20 U.S.C. § 1400(d)(1)(A) (emphasis added).

At the very least, the intent of Congress appears to have been to require a program providing a meaningful educational benefit towards the goal of self-sufficiency, especially where self-sufficiency is a realistic goal for a particular child.[17] Indeed, states providing no more than *some* educational benefit could not possibly hope to attain the lofty goals proclaimed by Congress. In evaluating whether an educational benefit is meaningful, logic dictates that the benefit "must be gauged in relation to a child's potential." *Polk*, 853 F.2d at 185. Only by considering an individual child's capabilities and potentialities may a court determine whether an educational benefit provided to that child allows for meaningful advancement. In conducting this inquiry, courts should heed the congressional admonishment not to set unduly low expectations for disabled children.

The obvious objection to the meaningful benefit standard is the expense involved. As the Supreme Court has noted, however, "There is no doubt that Congress imposed a significant financial burden on States and school districts that participate in the IDEA." *Florence County Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993) (rejecting argument that excessive cost of reimbursement could excuse school district from reimbursing parents in accord with IDEA's mandate). School districts are permitted to consider cost in devising an appropriate educational program. *E.g., Clevenger v. Oak Ridge Sch. Bd.*, 744 F.2d 514, 516-17 (6th Cir. 1984). A case such as Zachary Deal's, however, is precisely the sort of situation where judicial intervention is necessary to fulfill congressional intent and serve the public interest. Left to its own devices, a school system is likely to choose the educational option that will help it balance its budget, even if the end result of the system's indifference to a child's individual potential is a greater expense to society as a whole.

It has often been said that "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207-08 (stating that courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy). "[F]ederal courts are generalists with no expertise in the educational needs of handicapped children, and will benefit from the factfinding of a state agency with expertise in the field." *Renner*, 185 F.3d at 641 (quoting *Smith*, 879 F.2d at 1343); *see Metro. Bd. of Pub. Educ., Metro. Gov't v. Guest ex rel. Guest*, 193 F.3d 457, 462 (6th Cir. 1999) (noting that federal courts "are given the benefit of expert factfinding by a state agency devoted to this very purpose") (quoting *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir. 1989)). What seems to have been overlooked by the district court in this case is that the ALJ is a representative of the state presumed to have both the educational expertise and the ability to resolve questions of educational methodology that the federal courts do not have. While the district court always is required to give due deference to administrative findings in an IDEA case, even greater weight is due to an ALJ's determinations on matters for which educational expertise is relevant. *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003). The district court here does not appear to have

---

[17]The implication from these manifestations of congressional intent might be that, where self-sufficiency is a realistic goal for a child, a program that maximizes the possibility of self-sufficiency could be required.

accorded due deference to the ALJ's findings, especially in areas touching upon the ALJ's presumed educational expertise.

The Court is cognizant, however, that the ALJ did not have the benefit of the additional evidence provided to the district court at trial. On remand, the district court must carefully consider all of the evidence in this case, giving due deference to the ALJ's findings, in determining whether a substantive IDEA violation occurred under the meaningful benefit standard. In conducting this inquiry, the court should "carefully consider[] the student's individual abilities." *Ridgewood*, 172 F.3d at 248. The district court's decision regarding substantive violations is **REVERSED**, and this case is **REMANDED** to allow the court to determine whether the School System provided Zachary with a meaningful educational benefit.

### 4. Reimbursement

The ALJ awarded the Deals reimbursement for their home-based ABA program and for "related services," such as physical, speech, and occupational therapy. The ALJ found that the 1999-2000 IEP did not offer an education in the least restrictive environment, and that the parents' placement at the Primrose School did. He refused, however, to award the Deals reimbursement for that placement because they failed to give the School System the statutorily required notice. The district court reversed the ALJ's decision insofar as it required the School System to reimburse the Deals for any of the costs incurred by them in providing any educational services to Zachary. It affirmed the ALJ's decision to the extent that the decision denied reimbursement for other costs.[18]

Once an IDEA violation is found, the court is authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii). Parents are entitled to retroactive reimbursement if the school district failed to provide the student with a FAPE and if the private placement chosen by the parents was reasonably calculated to enable the child to receive educational benefits. *Florence County*, 510 U.S. at 11-16; *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 763 (6th Cir. 2001). "'[E]quitable considerations are relevant in fashioning relief,' and the court enjoys 'broad discretion' in so doing." *Florence County*, 510 U.S. at 16 (quoting *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374, 369 (1985)); *see Knable*, 238 F.3d at 771 ("[I]t is the district court's role in the first instance to weigh the equities in this case to determine the appropriate level of reimbursement to be awarded.").

Here, the Deals are entitled to reimbursement. The School System deprived Zachary of a FAPE by predetermining his placement and by failing to ensure the attendance of regular education teachers at certain IEP meetings. Furthermore, the district court has the opportunity, on remand, to find an additional, substantive, IDEA violation by the School System. The private educational services provided by the Deals clearly were proper under the IDEA. *See Florence County*, 510 U.S. at 11-16; *Knable*, 238 F.3d at 770-71. The district court's task on remand thus is to determine the level of reimbursement that is "appropriate" in light of the IDEA's purpose. *Burlington*, 471 U.S. at 369; *see Florence County*, 510 U.S. at 16 (stating that the district court "must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required"). For the reasons previously stated, the district court's reimbursement decision is **REVERSED**, and the case is **REMANDED** for the court to weigh the equities and determine the appropriate level of reimbursement.

---

[18] Plaintiffs-Appellants do not seek relief from this Court on the basis of the district court's denial of related services reimbursement, so the Court need not reach that issue. The Court also need not analyze the LRE issue since, even if the Court were to find that the 1999-2000 IEP violated the LRE requirement, there would be no basis upon which to reverse the ALJ's determination regarding the statutory notice.

### D. Award of Costs

The district court ordered that the School System "shall recover of the plaintiffs its costs of action." Plaintiffs-Appellants argue that this imposition of costs is "wholly erroneous and 'chilling.'"  Because, pursuant to this Court's instant rulings, Plaintiffs-Appellants are the prevailing parties, the district court's order on costs is **MOOT**, and the Court need not further consider the issue.

## IV.  CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the district court's decisions on the additional evidence and judicial notice issues.  The Court **REVERSES** the district court's determinations regarding procedural and substantive violations of the IDEA, as well as reimbursement relating to those violations. Because Plaintiffs-Appellants are now the prevailing parties, the issue of costs is **MOOT**.  This case is **REMANDED** for further proceedings in accordance with this opinion.