R.G. and C.G., individually and on behalf of F.G., Plaintiffs,

v.

The NEW YORK CITY DEPART-MENT OF EDUCATION, Defendant.

No. 11–CV–3544 (WFK)(VVP).

United States District Court, E.D. New York.

Oct. 25, 2013.

Lauren A. Baum, New York, NY, for Plaintiffs.

Serena Mabel Longley, New York City Law Department, New York, NY, for Defendant.

## DECISION AND ORDER

WILLIAM F. KUNTZ, II, District Judge.

R.G. and C.G., individually and on behalf of F.G. (collectively "Plaintiffs"), seek relief against the New York City Department of Education ("DOE" or "Defendant") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Plaintiffs contend Defendant failed to offer F.G., a child with special educational needs, a free appropriate public education program ("FAPE") as guaranteed by IDEA. In particular, Plaintiffs contend Defendant violated federal and New York law by, among other things, convening an inadequate committee to develop F.G.'s individualized education program ("IEP") and failing to base that IEP on a full assessment of F.G.'s abilities and needs. Because of these procedural defects, Plaintiffs argue the resulting IEP was substantively inadequate and the educational placement it recommended was inappropriate. Defendant concedes the composition of the committee was procedurally inadequate, but argues the commit-

tee had sufficient information to prepare the IEP and that the resulting IEP was appropriate. Two administrative officers who reviewed this case likewise found Defendant had committed a procedural violation, but disagreed as to whether the violation affected the resulting IEP and F.G.'s right to a FAPE.

For the reasons that follow, this Court finds Defendant's failure to convene an adequate committee to develop F.G.'s IEP constitutes a procedural violation of IDEA, which impeded F.G.'s right to a FAPE. Moreover, because the procedural violation prevented a full assessment of the appropriate placement for F.G., this Court orders Defendant to convene a legally sufficient committee to develop a new IEP and placement for F.G. In addition, pursuant to the pendency provisions of state and federal law, this Court directs Defendant to continue funding F.G.'s current special education programs until that process is complete.

## I. IDEA

■ Congress enacted IDEA "to ensure that all children with disabilities are provided 'a free appropriate public education [ ("FAPE") ].' " *Forest Grove Sch. Dist. v. T.A.,* 557 U.S. 230, 239, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009). To meet the requirements of IDEA, a school district must provide each student with a disability with a FAPE "that emphasizes special education and related services" tailored to meet the student's unique needs. 20 U.S.C. §§ 1400(d)(1)(A), 1401(9); *accord Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 379 (2d Cir.2003); *Walczak v. Florida Union Free Sch. Dist.,* 142 F.3d 119, 122 (2d Cir.1998).

The "central mechanism by which public schools ensure that their disabled students receive a free appropriate public education" is an individualized education pro-

gram ("IEP"). *Polera v. Bd. of Educ.*, 288 F.3d 478, 482 (2d Cir.2002); *see also* 20 U.S.C. §§ 1401(9), 1414(d). An IEP is a written statement, collaboratively developed by a child's parents and educators, that sets out, *inter alia*, a child's present levels of academic achievement and functional performance, annual academic and functional goals, how a child's progress towards those goals will be measured, and the services that will be provided to the child. 20 U.S.C. § 1414(d)(1); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir.2006). In New York, the team that creates an IEP is called a Committee on Special Education ("CSE"), and, as relevant here, must include: one or more of the student's parents; the student's regular education teacher if the student is or may be participating in a regular education environment; the student's special education teacher or provider; and a school psychologist. N.Y. Educ. Law §§ 4402(1)(b)(1)(a)(i)-(iv). New York law also requires that a CSE include several other individuals, such as a school district representative, *see id.* at §§ 4402(1)(b)(1)(a)(v)-(x), but these additional positions can be filled by one of the members already described or their presence can be waived. *See id.* at § 4402(1)(b)(1)(b).

■ "A school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir.2009) (internal editing and quotation marks omitted); *see also Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir.2007) (the IEP must "be 'reasonably calculated to enable the child to receive educational benefits' "). In addition,

IDEA requires states to provide special education and related services "in the least restrictive setting consistent with a child's needs," meaning that children with disabilities should be educated, " 'to the maximum extent appropriate,' together with their non-disabled peers." *Walczak*, 142 F.3d at 122 (quoting 20 U.S.C. § 1412(a)(5)). "Only 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated [into special classes]." *Id.; accord Grim*, 346 F.3d at 379. "However, a school district is not required to provide 'every special service necessary to maximize each handicapped child's potential,' ... or 'everything that might be thought desirable by loving parents.' " *Dirocco ex rel. M.D. v. Bd. of Educ. of Beacon City Sch. Dist.*, 11 Civ. 3897, 2013 WL 25959, at *1 (S.D.N.Y. Jan. 2, 2013) (Ramos, J.) (citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir.2005) and *Walczak*, 142 F.3d at 132).

■ A parent who believes that an IEP is insufficient may challenge it at a hearing before an impartial hearing officer ("IHO") appointed by the local school district. 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1)(a). "At that hearing, the school district has the burden of demonstrating the appropriateness of its proposed IEP." *Grim*, 346 F.3d at 379. "The decision of an IHO may be appealed to a[ ] [State Review Officer, or] SRO, ... [which] may in turn be challenged in either state or federal court." *Id.* at 380 (citing 20 U.S.C. § 1415(g), (i); N.Y. Educ. Law § 4404(2)); *see also* N.Y. Educ. Law § 4404(1)(c). During these challenges, the "pendency" provisions of both IDEA and New York State Education Law require that a student remain in his or her then-current educational placement, and that the New

York Department of Education continue to fund that placement, pending final disposition of, *inter alia,* a challenge to a child's IEP. 20 U.S.C. § 1415(j); N.Y. Educ. Law § 4404(4)(a); *Mackey ex rel. Thomas M. v. Bd. of Educ. for the Arlington Cent. Sch. Dist.,* 386 F.3d 158, 163 (2d Cir.2004). The district court is authorized to "grant such relief as the court determines is appropriate" based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C).

## II. Factual and Procedural Background

### A. F.G.'s Diagnosis and Early Education

F.G. has been receiving special education services since she was about two and a half years old, around the time she was diagnosed with a pervasive developmental disorder not otherwise specified (PDD–NOS). Pls.' 56.1 St. at ¶ 3; Transcript of the Hearing Before the Impartial Hearing Officer ("IHO Tr.") at 326:2–14; 327:6–14. She has significant developmental delays in her cognitive, attentional, and motor skills. Pls.' 56.1 St. at ¶ 4; IHO Tr. at 44:8–21; Dkt. No. 25 at 298 (Student Progress Report dated December 7, 2009). Reports by her teachers indicate that she has difficulty following simple commands and requires one-on-one direction, repetition, constant modeling, and visual prompting in order to understand and complete tasks. Dkt. No. 25 at 293 (Teacher's Report dated November 30, 2009), 298 (Student Progress Report dated December 7, 2009). At times, F.G. perseverates and is echolalic. Pls.' 56.1 St. at ¶¶ 6–7; IHO Tr. at 44:8–45:5. F.G.'s socialization skills are also delayed: she has difficulty sharing; is unaware of boundaries; and sometimes displays aggressive behaviors, including scratching, biting, and kicking. Pls.' 56.1 St. at ¶ 8; IHO Tr. at 47:1–48:17, 171:24–172:17, 241:21–242:5; Dkt. No, 25 at 298.

F.G.'s eligibility for special education programs and services is undisputed.

During the 2009–2010 school year, F.G. attended preschool classes at the Bright Smile Center where, pursuant to her IEP, she was placed in a general education classroom and received related special education services. Def.'s 56.1 St. at ¶¶ 2–3; Pls.' 56.1 St. at ¶ 14; Dkt. No. 25 at 236 (Notice of Modification of IEP dated August 20, 2009). F.G. was accompanied in the general education class by a Special Education Itinerant Teacher ("SEIT"), who used the Applied Behavior Analysis ("ABA") method to explain the teacher's instructions to her, break down the teacher's lessons into smaller units appropriate for F.G.'s comprehension level, keep F.G. focused, and respond to F.G.'s outbursts and sometimes aggressive behavior. Pls.' 56.1 St. at ¶ 3; IHO Tr. at 144:20–145:18, 186:11–17, 201:11–202:1; *see also R.E. v. New York City Dep't of Educ.,* 694 F.3d 167, 176 (2d Cir.2012) (ABA is an "intensive one-on-one therapy that involves breaking down activities into discrete tasks and rewarding a child's accomplishments") (internal quotation marks omitted). The SEIT also provided F.G. with individualized instruction outside of the classroom. IHO Tr. at 155:11–22. In addition, in accordance with her IEP, each week F.G. received five 45–minute sessions of speech/language therapy ("SLT"), three 30–minute sessions of occupational therapy ("OT"), and one 30–minute session of physical therapy ("PT"). Dkt. No. 25 at 255 (Conference Information: Related Service Recommendations, dated August 20, 2009); Def.'s 56.1 St. at ¶ 2.

### B. Development of F.G.'s IEP for the 2010–2011 School Year

On March 3, 2010, the Committee on Special Education ("CSE") convened a "turning five" meeting at F.G.'s preschool

to prepare a new IEP for her for the 2010–2011 school year. Pl.'s 56.1 St. at ¶ 16; Def.'s 56.1 St. at ¶ 9. The CSE Team consisted of Dr. Feige Shapiro, a school district psychologist; Ms. Yochaved Wasserman Adelman, one of F.G.'s SEITs for the 2009–2010 school year; and Plaintiff R.G., who is F.G.'s mother. Pl.'s 56.1 St. at ¶ 17; Def.'s 56.1 St. at ¶ 9. R.G. signed a document indicating that she had received a copy of materials regarding her rights as a parent, and also signed a letter declining the participation of an additional parent member at the meeting. Dkt. No. 25 at 300–01 (Declination Letter of Parent Member's Participation at the IEP Meeting dated March 3, 2010); Def.'s 56.1 St. at ¶ 10. No general education teacher participated in the meeting, as required by both federal and state law. Pls.' 56.1 St. at ¶ 18; see 20 U.S.C. § 1414(d)(1)(B)(ii); 34 C.F.R § 300.321(a)(2); N.Y. Educ. Law § 4402(1)(b)(1)(b); 8 N.Y.C.R.R. § 200.3(a)(1)(ii)).

In advance of the turning five meeting, Dr. Shapiro conducted an evaluation of F.G. Def.'s 56.1 St. at ¶ 7. Dr. Shapiro also reviewed numerous reports by F.G.'s teachers and therapists, and conducted a brief observation of F.G. with her SEIT outside the classroom. IHO Tr. at 38:19–39:21. With the exception of her own evaluation of F.G. and a social history report based on information from F.G.'s mother, Dr. Shapiro did not provide these reports to the other members of the CSE, either before or at the meeting. *Id.* at 39:22–40:13. Because the parties dispute whether the information available to Dr. Shapiro and the CSE was sufficient to create an adequate IEP, this Court examines these materials in detail:

- **Teacher Report dated November 30, 2009 (Dkt. No. 25 at 293):** This report, which was completed by F.G.'s SEIT providers, *see* IHO Tr. at 163:23–164:10, reflected F.G.'s then-current level of functioning and behavior in the classroom, with peers, and with adults. The report indicated that F.G. "has difficulty responding to adult intervention," "often … cannot keep up with group instruction" and "has difficulty completing tasks without one-on-one directives." F.G. also "has difficulty accepting limits and is unaware of boundaries." When upset, F.G. responds with "aggressive behaviors."

- **Related Services Student Progress Report for F.G.'s OT Services dated November 2009 (*Id.* at 294):** F.G.'s OT provider concluded F.G. had made progress "in graph motor skills, scissors skills and attention/focusing." F.G. was reported to utilize a dynamic tripod or static tripod grasp and was able to copy vertical and horizontal lines and circles. F.G. also had the ability to cut around a circle within one inch of the border, though she lacked a continuous smooth movement and required minimal to moderate assistance in negotiating turns while stabilizing the paper. With regard to F.G.'s attending skills, the report stated that F.G. could participate in an object finding game for twelve minutes with occasional cueing. The therapist recommended that F.G. "continue [the] OT program."

- **Related Service Student Progress Report for F.G.'s SLT Services dated December 12, 2009 (*Id.* at 295):** F.G.'s speech and language therapist concluded F.G. "has shown significant improvement in her ability to focus and attend to task" and "marked progress in her ability to relate to peers and adults." F.G. was able to comment, request items, and ask questions using good eye

contact. In addition, she could "answer many questions, comprehend short stories read to her, and use language to describe things." Despite these improvements, F.G. still had "significantly impaired receptive, expressive, and pragmatic language skills." She had difficulty following directions; comprehending pronouns, negatives, and descriptive and quantity concepts; and understanding inferences. She remained unable to answer questions logically, respond to "where" and "why" questions, explain how objects are used, or complete analogies. F.G.'s statements were not always context-appropriate. In addition, when frustrated, F.G. would yell and sometimes physically lash out.

- **Undated Student Progress Report for Annual Review for F.G.'s PT Services (*Id.* at 296–97):** F.G.'s physical therapist noted that F.G. "has made gains in all areas," particularly "step negotiation," "balance," and "jumping skills." Nonetheless, F.G. "demonstrate[ed] decreased body awareness, poor trunk control, [and a] decreased attention span," and she continued to have difficulty negotiating steps and throwing and catching a ball. The therapist recommended continued physical therapy.

- **Teacher Progress Report dated December 7, 2009 (*Id.* at 298–99):** This report, which was completed by F.G.'s SEIT providers in preparation for her annual review, described F.G. as having "delays in cognitive, speech, social and motor skills." Among other things, F.G. knew her name; was able to label shapes, colors, and her basic body parts; and could count up to ten with assistance. By contrast, F.G. did not know her birth date, did not understand most quantitative concepts, had difficulty sequencing, and could not use pronouns properly. Although the report indicated that F.G. was able to "follow the daily class routine," it also observed that she "cannot keep up during group instruction," "cannot follow simple commands," and required "multiple repetitions," "constant model[ing] and visual prompting," and "one-on-one attention to complete school tasks and classroom activities." F.G. was further described as having a "short attention span" and being "easily distracted," and therefore needed "continual verbal prompts and repetition to stay focused on materials and task[s] presented." Additionally, the report noted that, when upset, F.G. would respond aggressively. Nevertheless, the report indicated that F.G. was improving in her ability to respond to teacher intervention and praise and was benefiting from a reinforcement schedule. F.G.'s conversational skills had also improved and she engaged in on-topic conversations with greater frequency. The report recommended that she continue to receive special education and related services for twelve months.

- **Psychoeducational Evaluation (*Id.* at 289–92):** On January 13, 2010, Dr. Shapiro evaluated F.G. in order to determine appropriate educational and related services for the 2010–2011 school year. During the evaluation, F.G. was "highly distractible" with a "limited" ability to remain focused on tasks, and she "needed frequent breaks and became increasing[ly] resistant as the session progressed." F.G. had "much difficulty processing language and frequently

did not understand what was being ask of her." At times, F.G. perseverated and was echolalic. Administration of the Wechsler Preschool and Primary Scale of Intelligence test yielded a full scale IQ in the lower end of the Borderline range of cognitive functioning, placing F.G. in the 4th percentile of children her age. Administration of the Kaufman Survey of Early Academic Language Skills revealed that F.G.'s academic and language skills were well below average. Administration of the Adaptive Behavior subtest of the Development Assessment of Young Children yielded a score within the below average range. Dr. Shapiro observed that F.G., who comes from a bilingual English–Yiddish home, had "receptive and expressive language deficits in both languages" but that Yiddish translation sometimes proved helpful. Consequently, Dr. Shapiro recommended that F.G. be placed in a bilingual education environment.

- **Classroom Observation dated January 13, 2013 (*Id.* at 288):** On January 13, 2013, Dr. Shapiro also conducted a classroom observation of F.G. The observation took place outside the classroom with F.G., her SEIT teacher, and another student. Dr. Shapiro observed two separate activities. First, F.G. and the other student played a game in which they placed colored shapes on a board; F.G. "needed to be reminded to wait her turn but was then able to do so" and placed the pieces appropriately. Second, the two students played with play dough, during which F.G. took her turn when indicated and behaved appropriately.
- **Social History Update (*Id.* at 302):** On January 26, 2010, Dr. Shapiro

completed a social history update using information from F.G.'s mother. The social history reflected that the student had made significant progress in her program in expressive and receptive language. F.G. had also improved socially and behaviorally, although she was still aggressive at times. F.G.'s mother indicated that she was happy with F.G.'s program and progress and believed that it would be best for F.G. to continue with the same services for the 2010–2011 school year.

Based on all of this information, Dr. Shapiro prepared a draft IEP. IHO Tr. at 38:19–39:21, 69:16–19. Dr. Shapiro did not provide copies of this draft IEP to the other members of the CSE at the turning five meeting. *Id.* at 69:20–23.

At the CSE meeting, Dr. Shapiro recommended F.G. be classified as speech or language impaired and placed in a special education class with a special education teacher, a paraprofessional, and either six or twelve students (a "6:1:1" and "12:1:1" class, respectively). *Id.* at 76:2–25, 166:16–19, 214:4–8, 338:9–16. F.G.'s mother and SEIT provider both disagreed with the recommended placement and indicated that they thought she belonged in a general education setting with appropriate support. *Id.* at 213:19–214:18, 338:8–16. Both of them also informed Dr. Shapiro that F.G. had been previously diagnosed with PDD. *Id.* at 215:13–216:8, 333:24–334:13.

Despite the objections of all of the other CSE members, the final IEP classified F.G. as speech or language impaired and recommended F.G. be placed in a 12:1:1 special education class. Dkt. No. 25 at 267 (IEP Report at 1, dated March 3, 2010). In addition, based on Dr. Shapiro's decision alone, the IEP reduced F.G.'s SLT to

three 30–minute sessions per week and her OT to two 30–minute sessions per week. *Id.* at 287 (IEP Report: Related Service Recommendations); IHO Tr. at 61:6–11. The IEP maintained F.G.'s PT at one 30–minute session per week and also added a 30–minute counseling session each week. Dkt. No. 25 at 287 (IEP Report: Related Service Recommendations).

In June 2010, Defendant sent F.G.'s parents a Final Notice of Recommendation offering F.G. a placement in Class E81, a 12:1:1 special education class, at Public School ("P.S.") 205 for the 2010–2011 school year. Pls.' 56.1 St. ¶ 37; Dkt. No. 25 at 304 (Final Notice of Recommendation dated June 10, 2010). At R.G.'s request, Dr. Shapiro provided a tour of P.S. 205 and the offered class during the last week of the 2009–2010 school year. Pls.' 56.1 St. ¶¶ 38–39.

### C. F.G.'s Placement in a Private School

In August 2010, R.G. notified the CSE that she was declining the offered placement and that she intended to enroll F.G. at the Gan Yisroel School ("Gan Yisroel"). Dkt. No. 25 at 262–65 (Rejection Letter for F.G.). R.G. stated she was rejecting the placement at P.S. 205 because, *inter alia:* 1) the class would not provide F.G. with the "one to one direction" she needs to understand directions, keep up with classroom activities, and prevent her from withdrawing into her own world; 2) the children in the class appeared to be at a "significant[ly] lower level" than F.G. and F.G. therefore risked modeling their "bad behavior"; 3) R.G. had been told that the class teacher understands, but does not speak, Yiddish; and 4) the school was too large and F.G. was likely to get lost in it. *Id.*

F.G.'s parents placed her in a general education kindergarten class at Gan Yis-roel, where she continued to receive the same SEIT and related services that she had received the previous year at Bright Smile. Dkt. No. 24 at 8 (Decision of the State Review Officer ("SRO Op.") at 1); IHO Hearing Tr. 4:15–5:24, 12:22–13:1; Dkt. No. 25 at 225 (Request for Impartial Hearing, dated August 27, 2010, at 3). Gan Yisroel has not been approved by the Commission of Education "as a school with which school districts may contract to instruct students with disabilities." SRO Op. at 1–2 (citing 8 NYCRR §§ 200.1[d], 200.7).

### D. The Impartial Hearing Request

On August 27, 2010, F.G.'s parents requested an impartial hearing, alleging the CSE was improperly constituted, had failed to fully evaluate F.G.'s needs, had recommended inappropriate changes to F.G.'s program without sufficient justification, and had failed to provide R.G. with a meaningful opportunity to participate in the decision-making process. *See generally* Request for Impartial Hearing at 1–4. F.G.'s parents asked the IHO to find Defendant had failed to provide F.G. with a FAPE for the 2010–2011 school year, and requested funding, prospective payment, and/or reimbursement of F.G.'s tuition at Gan Yisroel, SEIT services, and related services. *Id.* at 4.

### E. The IHO Hearing and Decision

The IHO held two days of hearings on November 4 and 8, 2010. *See generally* IHO Tr. At the hearing, Defendant presented the testimony of Dr. Shapiro and Leonie Forde, Assistant Principal of P.S. 205. *Id.* at 19:14–82:2; 86:13–129:18. Defendant also offered in evidence all of the reports described above, as well as a copy of F.G.'s proposed 2010–2011 IEP, an undated rationale for placement prepared by Dr. Shapiro sometime after the CSE meet-

ing, two documents signed by R.G. indicating she had received materials regarding her rights as a parent and had declined the participation of a parent member at the CSE meeting, and the Final Notice of Recommendation. *Id.* at 13:6–17:13, 130:2–19. Plaintiffs presented the testimony of Ms. Yochaved Wasserman; Sara Wasserman and Malka Strohli, F.G.'s SEIT providers; Chaya Glick, Director of the Bright Smile Center where F.G. attended preschool; Gitty Schwartz, F.G.'s SL provider; and R.G. *Id.* at 136:16–228:10, 228:21–275:4, 276:10–279:12, 279:25–291:23, 292:14–323:19, 325:17–357:8. In addition, Plaintiffs offered in evidence R.G.'s impartial hearing request (as well as a later amended request and a later corrected request); F.G.'s Final Notice and Committee on Pre–School Education IEP for the 2009–2010 school year; due process responses from the DOE dated September 3, 2010 and November 3, 2010; and R.G.'s letter to the CSE declining the placement offered to F.G. for the 2010–2011 school year.[1] *Id.* at 17:14–19:13.

The IHO issued her decision on November 24, 2010. Dkt. No. 24 at 34–43 (Findings of Fact and Decision of the Impartial Hearing Officer ("IHO Op.")). The IHO concluded Defendant had failed to meet its burden of proving the appropriateness of the program recommended for F.G. *Id.* at 4–5. Specifically, the IHO concluded the CSE's recommended program was based on an incomplete evaluation because the CSE had failed to conduct an in-classroom observation of F.G. as required by law. *Id.* at 5. (citing 8 NYCRR 200.4[b][1][iv] ). The IHO found this failure "particularly significant" in light of the CSE's decision to place F.G. in a 12:1:1 class instead of a general education class. *Id.* Based on this deficiency, the IHO found that "the CSE's recommendation cannot be upheld." *Id.*

■ Nonetheless, the IHO declined to order the state to pay for the educational services F.G. was receiving at Gan Yisroel because the IHO concluded F.G.'s parents had not met their burden to prove that the educational program she was receiving there met her needs. *Id.* at 5–7. The IHO correctly stated the law: in determining whether a board of education should be required to pay for educational services obtained by a child's parents, the IHO must consider whether (1) the services offered by the board of education were inadequate or inappropriate, (2) the services selected by the parents were appropriate, and (3) equitable considerations support the parents' claim. *Id.* at 5 (citing *Sch. Comm. of the Town of Burlington v. Dep't of Educ., Massachusetts,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)). In this case, the IHO found Plaintiff's petition failed on the second prong. *Id.* at 6–7. Although F.G.'s parents had not contested her classification as speech and language impaired, the IHO *sua sponte* concluded F.G. should have been classified as autistic. *Id.* at 6. The IHO then found that F.G.'s general education class could not meet her unique needs due to her cognitive, academic, and social delays; inability to follow and be managed by the teacher; inability to focus; and dangerousness to herself and others. *Id.* Consequently, the IHO concluded F.G.'s parents had placed her "in an inappropriate class and wants to correct that placement by providing for a one to one SEIT teacher," even though a "one to one SEIT teacher is not a substitute for an appropriate program," *Id.* at 7.

---

1. The parties agreed that F.G.'s pendency placement was that provided in her 2009–2010 IEP SRO Op at 7 During the hearing, F.G.'s parents withdrew their request for tuition reimbursement, but maintained their request for funding of an SEIT teacher and related services. *Id.;* IHO Tr. at 351:3–6.

Consequently, the IHO denied Plaintiffs' request to require Defendant to pay for F.G.'s SEIT and related services.

F.G.'s parents appealed the IHO's denial of their claim for funding for F.G's SEIT and related special education services. SRO Op. at 8. Defendant cross-appealed, claiming it had provided F.G. with a FAPE and the IHO's finding to the contrary should be overturned. *Id.*

**F. The SRO Decision**

In a detailed and thorough opinion, the SRO sustained the cross-appeal, holding Defendant had offered F.G. a FAPE for the 2010–2011 school year. *See generally* SRO Op. In reaching this decision, the SRO considered the composition of the CSE; the evaluative data relied upon by the CSE; the IEP's description of F.G.'s then-present levels of performance and annual goals; the recommended placement in a 12:1:1 class; whether the recommended placement was in the least-restrictive environment; the proposed reduction in related services; and the characteristics of the assigned school. *Id.* at 12–23.

The SRO agreed with the IHO that Defendant had violated federal and state regulations by failing to have a regular education teacher present at the CSE meeting. *Id.* at 12–13. Nevertheless, the SRO found "the hearing record does not demonstrate that this procedural inadequacy impeded the student's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or cause a deprivation of educational benefits." *Id.* at 13. In making this determination, the SRO considered that:

[i]n the absence of a regular education teacher, the hearing record reflects that the CSE was able to sufficiently consider whether a general education environ-ment would have been appropriate for the student based on the overall identification of the student's needs and abilities, which were reflected in the reports before the CSE and by the participation of the student's mother and the student's SEIT, who had worked with the student in a setting that included the student's typically developing peers.

*Id.* For these reasons, the SRO found "that the hearing record contains insufficient evidence to conclude that the failure to include a regular education teacher at the March 2010 CSE meeting rose to the level of a denial of a FAPE." *Id.*

In addition, the SRO disagreed with the IHO that Dr. Shapiro's observation of F.G. outside of the classroom failed to comply with statutory requirements. *Id.* at 16. Specifically, the SRO noted that state regulations require a student evaluation to include:

an observation of the student in the student's learning environment (including the regular classroom setting) or, in the case of a student of less than school-age or out of school, an environment appropriate for a student of that age, to document the student's academic performance and behavior in the areas of difficulty.

*Id.* at 15 (citing 8 NYCRR § 200.4(b)(1)(iv)). The SRO found Dr. Shapiro's observation "appropriate under the circumstances of this case in which the student received SEIT services in both a pull-out environment and in a general education classroom, and where the classroom in which the student was integrated was staffed by both a regular education teacher and a special education teacher." *Id.* at 16. The SRO did not consider concerns about the brevity of the observation, the fact that the peer also had a learning disability, or Dr. Shapiro's refusal to observe F.G. in the classroom. IHO Hearing

Tr. at 156:3–157:24. Nor did the SRO consider the IHO's concern that the failure to conduct an observation in F.G.'s general education classroom was "particularly significant" in light of the CSE's decision to remove F.G. from a general education class and place her in a 12:1:1 special education class. IHO Op. at 5.

The SRO concluded that F.G.'s recommended placement in a 12:1:1 special education class with a bilingual Yiddish teacher with related services including counseling, OT, PT, and SLT was appropriate for, and reasonably calculated to provide educational benefits to, F.G. SRO Op. at 17–18. Specifically, the SRO found that a 12:1:1 bilingual class could have addressed F.G.'s special needs, particularly those in speech and language, positive behavior reinforcement, and development of social skills. *Id.* at 17. In addition, the SRO noted that a 12:1:1 class "can employ various methodologies as well as manipulatives, reinforcement, repetition, and schedules" to meet students' needs. *Id.*

In reaching its determination that the recommended placement was appropriate, the SRO rejected the concerns of F.G.'s parents that a 12:1:1 special education class would have been too restrictive. *Id.* at 18–20. The SRO found the recommended placement was the least restrictive environment for F.G. in light of her "significant deficits in attention, cognition, academic skills, speech-language skills, social/emotional, and behavior skills" and since F.G. could be "educated satisfactorily" in a special education class. *Id.* at 19–20. Moreover, this placement still would have permitted F.G. to access school programs with general education peers during music classes, during school assemblies, and on the playground. *Id.* at 20.

Finally, the SRO concluded the CSE had explored, but appropriately rejected,

other options. *Id.* For example, the CSE had considered a "general education setting without support and rejected it as it would not provide the support necessary for successful functioning in a school environment." *Id.* at 20. In addition, "the school psychologist who served as the CSE chairperson testified that she did not recommend continuation of a 1:1 SEIT in the general education setting because she believed that one of the main goals as a student gets older is to foster greater independence, and that extending the time that a student has a 1:1 SEIT can be counter productive as it can create greater dependence." *Id.* The SRO did not address the fact that two of the three members of the CSE had favored placing F.G. in a general education environment with a 1:1 SEIT but had been overruled by a single member of the committee.

Based on the foregoing, the SRO found that Defendant had offered F.G. a FAPE for the 2010–2011 school year. Consequently, the SRO found it unnecessary "to reach the issue of whether the 1:1 SEIT or related services were appropriate for the student or whether equitable considerations support the parents' claim" for tuition reimbursement. *Id.* at 23.

## G. This Litigation

Plaintiffs timely filed this action appealing the SRO's decision on September 22, 2011. Plaintiffs allege the IEP was procedurally and substantially inadequate and the resulting placement recommendation was inappropriate to meet F.G.'s needs. Plaintiffs therefore seek a finding that F.G. was denied a FAPE in the least restrictive environment. Plaintiffs also argue the placement at Gan Yisroel, as paired with SEIT and related services, is appropriate. Finally, Plaintiffs argue the equities favor an award of funding for

F.G.'s SEIT and related services. *See generally* Pls.' Br.

Defendant concedes the CSE team was procedurally defective, but argues the IEP and placement recommendation were appropriate to the needs of F.G. Defendant contends Gan Yisroel, by contrast, is not appropriate in light of the IEP. Finally, Defendant contends the equities disfavor reimbursement. *See generally* Def.'s Br.

### III.  Standard of Review

A motion for summary judgment in an IDEA action "differs from an ordinary summary judgment [motion under Federal Rule of Civil Procedure 56] in that the existence of a disputed issue of fact will not defeat the motion." *Student X v. N.Y.C. Dep't of Educ.*, No. 07–CV–2316, 2008 WL 4890440, at *3 (E.D.N.Y. Oct. 30, 2008) (Garaufis, J.). An IDEA summary judgment motion instead merely "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits." *Lillbask v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir.2005) (internal quotation marks omitted); *see also Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir.1995) ("Though the parties [in an IDEA action] may call the procedure 'a motion for summary judgment' ..., the procedure is in substance an appeal from an administrative determination, not a summary judgment.").

In reviewing an administrative determination under IDEA, a federal court must independently review the administrative record, along with any additional evidence presented by the parties, and determine by a preponderance of the evidence whether IDEA'S provisions have been met. *S.W. v. New York City Dept. of*

*Educ.*, 646 F.Supp.2d 346, 351 (S.D.N.Y. 2009) (Koeltl, J.) (citing *Grim*, 346 F.3d at 380); 20 U.S.C. § 1415(i)(2)(C). Nonetheless, it is well established that the "role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed," *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir.2009), and a district court's obligation to conduct an " 'independent' review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities they review,'" *Walczak*, 142 F.3d at 129 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 204, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). A district court must give "due weight" to the prior administrative proceedings, "mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* (internal quotation marks omitted).

Where, as in this case, the decisions of an IHO and a SRO conflict, the Court should generally defer to the SRO's decision as the "final decision of the state authorities," *R.E.*, 694 F.3d at 189 (citing *A.C.*, 553 F.3d at 171), particularly "when the state officer's review 'has been thorough and careful,'" *id.* at 184 (quoting *Walczak*, 142 F.3d at 129). Determinations by an IHO or SRO that involve the substantive adequacy of an IEP or the adequacy of an educational methodology should be given more deference than determinations about an IEP's procedural validity or whether objective indications of a student's progress exist. *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir.2012). A district court is also advised to "afford more deference when its review is based entirely on the same evi-

dence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency." *Id.* Nevertheless, "the court may reject factual findings that are not supported by the record or are controverted by the record." *Weaver v. Millbrook Cent. Sch. Dist.,* 812 F.Supp.2d 514, 521 (S.D.N.Y.2011) (Karas, J.).

▉▉▉▉ Judicial review under IDEA follows a three-part analysis:

First, the court asks whether the State complied with the procedures set forth in [IDEA]. Second, the court asks whether the IEP developed through [IDEA]'s procedures is reasonably calculated to enable the child to receive educational benefits. If an IEP is deficient—either procedurally *or* substantively—the court then asks whether the private schooling obtained by the parents for the child is appropriate to the child's needs.

*M.H.,* 685 F.3d at 245 (internal citations, alterations and quotation marks omitted and emphasis added). In analyzing the third question, "equitable considerations relating to the reasonableness of the action taken by the parents are relevant." *Id.*

## IV. The CSE Team that Created the 2010–2011 IEP Was Procedurally Defective

▉▉▉▉ In this case, there is no dispute that the CSE team was procedurally defective. A CSE must include at least one of the student's regular education teachers if the student is, or may be, participating in a regular education environment. 20 U.S.C. § 1414(d)(1)(B)(ii); 34

C.F.R. § 300.321(a)(2); N.Y. Educ. Law. § 4402(1)(b)(1)(b); 8 N.Y.C.R.R. § 200.3(a)(1)(ii)). Further, "[t]he regular education teacher who serves as a member of a child's IEP team should be a teacher *who is* or *may be* responsible for implementing a portion of the IEP." *Dirocco,* 2013 WL 25959 at *17 (emphasis in original and citation omitted). Here, even though F.G. had been attending a general education preschool class, no regular education teacher, much less a regular education teacher who was or might have been responsible for implementing a portion of F.G.'s IEP, participated in the March 2010 CSE meeting. Def.'s Br. at 7. The SRO thus properly concluded Defendant violated federal and state regulations regarding the composition of the CSE.[2] SRO Op. at 13.

## V. The Procedural Defect Impeded F.G.'s Right to a FAPE

Compliance with IDEA's procedural requirements "is no mere formality." *Davis v. Wappingers Cent. Sch. Dist.,* 431 Fed. Appx. 12, 14 (2d Cir.2011). " [A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.' " *Walczak,* 142 F.3d at 129 (quoting *Rowley,* 458 U.S. at 206, 102 S.Ct. 3034). Indeed, when one compares the "elaborate and highly specific procedural safeguards" embodied in IDEA with the "general and somewhat imprecise substantive admonitions contained in the Act … the importance Congress attached to these procedural safeguards cannot be gainsaid." *Rowley,* 458 U.S. at 205, 102 S.Ct. 3034 (referring spe-

---

**2.** The Court notes this is not the first time Defendant failed to include a general education teacher in the team preparing F.G.'s IEP. In August 2009, the Committee on Preschool Education (CPSE) that approved F.G.'s IEP did not include a general edu-

cation teacher, Dkt. No. 25 at 239 (Conference Information Form dated August 20, 2009), even though a general education environment was being considered, and was ultimately approved, for F.G., *id.* at 253 (School Environment and Service Recommendations).

cifically to the provisions in 20 U.S.C. § 1415).

Nonetheless, "not every procedural error will render an IEP legally inadequate." *M.H.*, 685 F.3d at 245. "Relief is warranted only if the alleged procedural inadequacies '(I) impeded the child's right to a FAPE; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a FAPE to the parents' child; or (III) caused a deprivation of educational benefits.' " *Id.* (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)) (internal brackets omitted). "That is, parents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir.2013).

In this case, Plaintiffs allege the exclusion of F.G.'s regular education teacher from the CSE impeded F.G.'s right to a FAPE. The Court agrees for two reasons. First, IDEA conveys a clear Congressional preference for integrating children with disabilities into regular education classrooms. Second, federal courts to have considered the issue have universally agreed that the participation of a child's regular education teacher at a CSE is a critical procedural mechanism to realizing the mainstreaming objectives articulated by the IDEA.

In enacting IDEA, Congress established that a child's right to a FAPE includes the right to be educated " 'to the maximum extent appropriate,' . . . with [his or her] non-disabled peers." *Walczak*, 142 F.3d at 122 (citing 20 U.S.C. § 1412(a)(5)). This "strong preference for 'mainstreaming,' " *Grim*, 346 F.3d at 379, helps to ensure that disabled students "meet developmental goals" and are "prepared to lead productive and independent adult lives." 20 U.S.C. § 1400(c)(5); *see also Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1213–14 (3d Cir.1993) (IDEA'S mainstreaming provisions express a " 'strong congressional preference' for integrating children with disabilities in regular classrooms"). "Only 'when the nature or severity' of a child's disability is such 'that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily' should a child be segregated [into special classes]." *Walczak*, 142 F.3d at 122. The burden of demonstrating the appropriateness of a proposed IEP, including whether a mainstream placement received appropriate consideration, rests on the school district. *See Grim*, 346 F.3d at 379.

Participation in the CSE of a regular education teacher who is or may be responsible for implementing a portion of a child's IEP is critical to meeting IDEA'S mainstreaming objective. *See Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 860 (6th Cir.2004). By providing information about the general education curriculum, as well as the student's progress and challenges in that environment, a regular education teacher helps ensure full consideration of a child's ability to remain in regular education classes with the use of supplementary aids and services. *See id.* ("The input provided by a regular education teacher is vitally important in considering the extent to which a disabled student may be integrated into a regular education classroom and how the student's individual needs might be met within that classroom."); *see also M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 649 (9th Cir.2005) ("[A]ny regular education teacher would have contributed his or her knowledge of the ability of a disabled student to benefit from being placed in a regular classroom."). "While the presence of a regular

education teacher at a CSE's meeting does not guarantee a child will receive a mainstream placement, it does help to ensure that this option receives fair consideration." *J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F.Supp.2d 606, 653 (S.D.N.Y.2011) (Young, J.).

In this case, the Court finds that the failure to include a general education teacher on F.G.'s CSE impeded F.G.'s right to a FAPE because the record in this case unambiguously demonstrates that a mainstream placement did not receive fair consideration, as required by both federal and state law. It is undisputed that no general education teacher was present at the meeting that formulated F.G.'s IEP, despite the statutory mandate requiring one and the considerable case law finding that inclusion of a general education teacher is critical to ensuring the fair consideration of a mainstream placement. More importantly, there is almost no evidence in the record that a mainstream placement received any consideration at all—much less fair consideration. Two of the three members of the CSE testified before the IHO that the only placements considered were 6:1:1 and 12:1:1 special education classes, and that Dr. Shapiro ignored or overruled their disagreement with those placements and their attempts to discuss a general education placement. IHO Tr. at 166:16–167:12, 213:21–25, 338:9–339:8. In fact, the sole evidence the CSE considered a mainstream placement at all was a single sentence to that effect by Dr. Shapiro during the hearing before the IHO. Tr. at 62:15–19; *see also id.* at 166:16–19 (indicating that the only placements considered were 6:1:1 and 12:1:1 special education classes). However, there is no evidence in the record to support this lone assertion such that the administrative reviewers or this Court could conclude the CSE actually considered a mainstream placement—for example, evidence about the materials the

CSE considered to determine whether a mainstream placement would have been appropriate for F.G., whether the CSE considered those materials sufficient, whether the CSE weighed the benefits and disadvantages of a mainstream placement, or why a mainstream placement was rejected for F.G.

Moreover, contrary to the SRO's finding, there is no evidence that the CSE had before it reports regarding F.G.'s needs and abilities from which it might have sufficiently considered whether a general education environment would have been appropriate for F.G. *See* SRO Op. at 13. Dr. Shapiro explicitly testified that, with the exception of her own evaluation of F.G. and a social history report based on information from F.G.'s mother, Dr. Shapiro did not provide any reports to the two other members of the·CSE. IHO Tr. at 39:22–40:13. It is true that Dr. Shapiro had copies of the reports previously described, *id.* at 38:19–39:21, but Dr. Shapiro, by herself, is not the CSE.

Close review of the reports available to Dr. Shapiro—but not to the two other members of the CSE—reveals that F.G. had made significant progress during the 2009–2010 school year, when she attended a general education class accompanied by a SEIT and received related services in a pull-out environment. *See, e.g.,* SLT Progress Report dated December 12, 2009 (concluding that F.G. "has shown significant improvement in her ability to focus and attend to task" and "marked progress in her ability to relate to peers and adults"); undated PT Progress Report (noting that F.G. "has made gains in all areas"); OT Progress Report dated November 2009 (noting specific skills in which F.G. had made progress); Social History Update (noting F.G. had made significant progress in her program in expressive and receptive language, and had also improved socially

and behaviorally). To the extent the issue was addressed, every teacher and service provider recommended F.G. continue with her current program. *See* Teacher Progress Report dated December 7, 2009 (recommending F.G. continue her program for another twelve months); OT Progress Report dated November 2009 (recommending that F.G. "continue [the] OT program"); Undated PT Progress Report (recommending continued physical therapy); Social History Update (F.G. should continue with the same services for the 2010–2011 school year); *see also* IHO Tr. at 282:12–283:16 (F.G.'s SLT provider prepared goals for F.G.'s IEP based on the belief that F.G. would continue to receive five days of SLT each week, and she did not consider a reduction in frequency appropriate). Dr. Shapiro overruled not only the other two members of the CSE, but all of F.G.'s teachers and service providers, in deciding to place F.G. in a 12:1:1 special education class.

Finally, F.G.'s proposed IEP indicates the CSE did not consider placing F.G. in a mainstream classroom with supplementary aids and services, such as an SEIT. IDEA expressly provides that "removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes *with the use of supplementary aids and services* cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A) (emphasis added). One of the aids a school should consider, in appropriate circumstances, is a

one-on-one SEIT. *Oberti,* 995 F.2d at 1216; *J.G. ex rel. N.G.,* 777 F.Supp.2d at 654 ("But it is within the purview of even this Court's limited knowledge of special education that this problem likely could have been remedied with a one-to-one classroom aide—a possibility that [the school district] apparently did not consider."). Here, however, the IEP unambiguously indicates that such support was never considered. In the section entitled, "Other Programs/Services Considered and Reasons for Rejection," the IEP states: *"General education without support* was rejected because this does not provide the support need [sic] for successful functioning in a school environment." Dkt. No. 25 at 286 (emphasis added). It is indisputable that placement in a general education classroom with supplementary services, such as an SEIT, is not "general education without support." The CSE's failure to consider placing F.G. in a general education classroom *with supplementary aids and services* compels the conclusion that the CSE did not give fair consideration to a mainstream placement. *See J.G. ex rel. N.G.,* 777 F.Supp.2d at 640 ("If the school has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive.") (citation omitted).[3]

For all of the foregoing reasons, this Court concludes that the failure to include

---

**3.** The only other option the CSE considered was placing F.G. in a specialized school. Dkt. No. 25 at 286 (Other Programs/Services Considered and Reasons for Rejection). The SRO noted that "the school psychologist who served as the CSE chairperson testified that she did not recommend continuation of a 1:1 SEIT in the general education setting because she believed that one of the main goals as a student gets older is to foster greater indepen-

dence, and that extending the time that a student has a 1:1 SEIT can be counter productive as it can create greater dependence." SRO Op. at 20. Again, this Court emphasizes that the school psychologist, alone, is not the CSE, and thus there was no evidence in the record that the CSE considered continuation of F.G.'s general education program with a one-on-one SEIT provider.

a general education teacher on F.G.'s CSE prevented fair consideration of a mainstream placement, thereby impeding F.G.'s right to a FAPE. *See S.B. ex rel. Dilip B. v. Pomona Unified Sch. Dist.*, No. CV 06–4874, 2008 WL 1766953 at *14 (C.D.Cal. Apr. 15, 2008) (Mate, J.) (failure to include a general education teacher on the CSE team resulted in a student's loss of educational opportunity and denied the student a FAPE). Of course, this Court recognizes that the inclusion of a general education teacher on the CSE that developed F.G.'s IEP would not necessarily have led to the formulation of a different IEP. *See id.* at *13 (acknowledging that the court could not determine whether a general education teacher would have been able to persuade the other team members to formulate a different IEP). But the teacher would have had the opportunity to provide his or her views about F.G.'s needs and to persuade the other members to consider a general education placement—a statutorily mandated process and a particularly critical role in light of the split views on the CSE.

## VI. Remedy

■ In an IDEA action, the district court is authorized to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii), A court has broad discretion in granting appropriate relief, and "equitable considerations are relevant in fashioning relief" and may be considered. *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 374, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

■ . Typically, a district court that has determined that a defendant has impeded a student's right to a FAPE would then consider whether the student's parents are entitled to reimbursement for the costs of placing their child in an alternative setting.

*See* 20 U.S.C. § 1412(a)(10)(C)(ii) (providing for retroactive reimbursement to parents of the costs of their child's private placement if a hearing officer or court determines that the district failed to provide the child with a FAPE). Assessment of such costs "merely requires the [defendant] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." *Burlington,* 471 U.S. at 370–71, 105 S.Ct. 1996.

■ In this case, the IHO determined in an interim decision, pursuant to an agreement between the parties, that F.G.'s pendency placement was that provided in her 2009–2010 IEP, meaning that F.G. was entitled to continue receiving, and Defendant was obligated to continue paying for, the services provided in F.G.'s 2009–2010 IEP. SRO Op. at 7. Accordingly, Defendant has been paying, and must continue to pay, for F.G.'s special education services, pursuant to 20 U.S.C. § 1415(j) and N.Y. Educ. Law § 4404(4)(a), until there is a final decision regarding the validity of F.G.'s 2010–2011 IEP. Def.'s Br. at 1–2; Def.'s Reply at 1; Pls.' 56.1 St. at ¶ 89. Under these circumstances, Plaintiffs have not incurred any costs for placing F.G. in an alternative educational setting, and therefore the question of "reimbursement" for the parents is not before this Court.

Instead, the appropriate remedy for Defendant's failure to include a general education teacher on the CSE that formulated F.G.'s IEP, which failure impeded F.G.'s right to a FAPE, is to require Defendant to constitute a legally sufficient CSE to develop a new IEP and recommended placement for F.G. *See M.L.,* 394 F.3d at 636 (concluding that the failure to include a general education teacher on the IEP team was a procedural error, and remanding "with instructions that the district court enter an order directing the

[School District] to select an IEP team that complies with the procedural requirements of the IDEA"). While requiring Defendant to create a new IEP for F.G. cannot undo the harm inflicted by Defendant's inadequate earlier process, it does ensure that the CSE fully and fairly considers whether a general education environment, with appropriate support, can provide F.G. with an education likely to produce progress, not regression. *See Rowley*, 458 U.S. at 206, 102 S.Ct. 3034 ("[T]he congressional emphasis upon full participation of concerned parties throughout the development of the IEP, as well as the requirements that state and local plans be submitted to the Secretary for approval, demonstrates the legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.").

This Court reminds Defendant that, in constituting a new CSE to develop an IEP for F.G., Defendant must meet anew all of the legal requirements for that CSE. For example, Defendant is required to inform F.G.'s parents that they may invite individuals "who have knowledge or special expertise" about F.G. to participate on the CSE team. 34 C.F.R. § 300.322(b)(1)(ii). The CSE must also include a parent member, or F.G.'s parents must sign a new waiver declining participation of a parent member. The IEP must be based upon a current assessment of F.G.'s abilities and needs, including a classroom observation. 34 C.F.R. §§ 300.305, 300.324, 8 N.Y.C.R.R. § 200.4(b). In addition, pursuant to the pendency provisions of state and federal law, this Court directs Defendant to continue funding F.G.'s current special education programs until the process of preparing a new IEP is complete and any objections to that IEP have been finally resolved.[4]

Finally, in ordering Defendant to constitute a new, legally sufficient CSE to prepare a new IEP for F.G., this Court emphasizes that it is not mandating a specific IEP or placement for F.G. It is entirely possible that even a properly constituted CSE would ultimately create an IEP similar, or nearly identical, to that at issue in the present action. This Court is requiring only that the process conform to those standards set down by Congress and the state of New York to ensure that handicapped students receive a free and appropriate education in the least restrictive environment. Ultimately, the develop-

---

**4.** The Court strongly urges the parties to diagnose F.G.'s learning disabilities, to the extent possible. According to F.G.'s mother, F.G. has a pervasive developmental disorder not otherwise specified. IHO Tr. at 327:6–14. However, this diagnosis is not otherwise supported by the record. At the IHO Hearing, two of F.G.'s special education providers testified that they believed F.G. to be autistic, IHO Tr. at 216:5–8, 254:2–7, and, based on that testimony, the IHO found that F.G.'s "behaviors are descriptive of the definition of Autism," *see* IHO Op. at 6. F.G.'s parents contested this classification on appeal before the SRO, and the SRO agreed the IHO had exceeded the scope of the impartial hearing by deciding an issue that was not properly before her. SRO Op. at 11–12. Yet, on ap-

peal to this Court, F.G.'s parents appear to suggest that F.G. is, in fact, autistic, *see* Pls.' Br. at 14 (arguing that the class recommended for F.G. did not use "instructional methods appropriate for students on the autistic spectrum like F.G.") and 22 (F.G.'s current program is implemented by "educators who are experienced ... in working with students on the autistic spectrum who have needs like F.G.'s"), a classification which, this Court notes, is subject to specific guidelines under New York law. *See, e.g.*, 8 N.Y.C.R.R. § 200.13. Regardless of whatever F.G.'s ultimate diagnosis may be, this Court underscores that agreement on an accurate diagnosis of F.G.'s learning disabilities would be helpful to the CSE in creating an IEP that meets F.G.'s unique educational needs.

ment of F.G.'s IEP, and the specific nature of her placement, is the province of the CSE. *Cf. A.C. ex rel. M.C.*, 553 F.3d at 171 (emphasizing the "circumscribed" role of the courts).

## VII. Conclusion

After reviewing the record and according due weight to the administrative decisions in this action, this Court finds the CSE team that created F.G.'s 2010–2011 IEP was procedurally inadequate because it failed to include a general education teacher as required under both federal and state law. Moreover, under the circumstances of this case, this Court finds that this procedural defect impeded F.G.'s right to a FAPE, thereby resulting in a substantive violation of IDEA. The motion for summary judgment by the Plaintiffs is therefore GRANTED in significant part. The motion for summary judgment by the Defendant is therefore DENIED in its entirety. The Court orders Defendant to constitute a legally sufficient committee to develop a new IEP and placement for F.G. In addition, pursuant to the pendency provisions of state and federal law, this Court directs Defendant to continue funding F.G.'s current special education programs until that process is complete.

*SO ORDERED*